**UNITED STATES, Appellee,**

v.

**María MULINELLI–NAVAS,
Defendant—Appellant.**

No. 96–1462.

United States Court of Appeals,
First Circuit.

Heard Nov. 4, 1996.

Decided May 5, 1997.

As Amended May 23, 1997.

Linda Backiel, with whom Luis F. Abreu–Elías was on brief for defendant–appellant.

María A. Domínguez, Assistant United States Attorney, with whom Guillermo Gil, United States Attorney, José A. Quiles–Espinosa, Senior Litigation Counsel, and Nelson Pérez–Sosa, Assistant United States Attorney, were on brief for appellee.

Before TORRUELLA, Chief Judge, COFFIN and CAMPBELL, Senior Circuit Judges.

TORRUELLA, Chief Judge.

On August 9, 1995, María Mulinelli–Navas ("Mulinelli") was charged with conspiracy to commit bank fraud, in violation of 18 U.S.C. § 371, making false statements to a federally insured financial institution, in violation of 18 U.S.C. § 1014, and bank fraud, in violation of 18 U.S.C. § 1344. On December 21, 1995, a jury returned a guilty verdict on all counts and she was subsequently sentenced to 27 months for each count, to be served concurrently, and three years supervised release. Mulinelli appeals only her convictions, claiming that: (1) the district court's limitation on her cross-examination of her accomplices deprived her of her Sixth Amendment right to confrontation; (2) the district court abused its discretion by not allowing Mulinelli to introduce extrinsic evidence to impeach an accomplice; (3) the district court abused its discretion by admitting into evidence an improperly authenticated summary chart; and (4) the district court, by overruling certain objections, deprived her of the ability to present her defense to the jury. For the reasons stated herein, we vacate Mulinelli's conviction and sentence on Counts V and VI and affirm as to all other issues.

## BACKGROUND

The jury could have found the following facts. Mulinelli was Senior Vice President of First Federal Savings Bank, in charge of car loans. Between 1985 and 1988, First Feder-

al approved loans to two dealers who, in fact, neither bought nor sold the cars for which the loans were made. Furthermore, these loans involved irregular financing, with low monthly payments and large balloon payments at the end of one year.

The indictment charged Mulinelli with conspiring to approve fraudulent loans of $25,000 in 1985 and $273,000 from 1987 to 1988 to Luis López–Mendoza ("López"), and $130,000 in June 1988 to Lázaro Exposito Cordovés ("Exposito").

At trial, the two auto dealers testified. One of the auto dealers, López, President and owner of Cordillera Auto, testified that he was approached by Mulinelli with a request that he loan her money. In response to his statement that he was not in the business of lending money, Mulinelli suggested a financing scheme by which López would apply for a loan on a non-existent car. According to the loan documents and disbursement check, the loan was taken out in the name of Mulinelli's daughter for a Volvo station wagon that was never actually purchased. They carried out the scheme she described: upon receiving the loan check, he deposited the amount, then gave Mulinelli a $25,000 loan from cash on hand at his business. Mulinelli's daughter testified that she signed for a $25,000 loan to purchase a family car that Mulinelli put in the daughter's name because of credit problems. She testified that the handwriting on the sales contract "looked like my mother's."

In 1985, López approached Mulinelli about obtaining financing of a type not available from First Federal. Mulinelli suggested a similar scheme, whereby López would execute blank contracts, stamped with the seal of Cordillera Auto and would deliver the blank documents to Mulinelli for her approval. López used these loans to finance cars he was purchasing for eventual resale. A similar strategy was used to provide loans to another dealer, Exposito, President of Caguas Auto Wholesale. Both López and Exposito testified that they signed and sealed blank forms for car sales contracts, which they delivered to the bank for completion.

During his testimony, López recanted statements made in an earlier affidavit, in which he denied that Mulinelli had knowledge of the fraud. He testified that he lied because the attorney to whom he made the affidavit told him, before starting the tape recorder, that the attorney's purpose was to "protect" Mulinelli. The defense sought to introduce the testimony of the attorney regarding whether he actually stated that the purpose of his meeting with López was to protect Mulinelli. After hearing the attorney's proposed testimony out of the presence of the jury, the trial court upheld the prosecution's objection that his testimony was extrinsic evidence on a "collateral matter" and thus was inadmissible.

Exposito testified about two loans made in 1988 to Caguas Auto Wholesale, purportedly to finance purchases for a rental business ("Zoom") that Exposito never established. Exposito approached Mulinelli and informed her that he needed money. She told him to bring her contracts and bills of sale for cars that he would sell from his dealership to this sham car rental business so that she could approve loans for their purchase. For the first loan, Mulinelli requested that Exposito provide her with a bill of sale and a loan application reflecting the sale of cars that he never purchased. Two hours after he delivered the documents to Mulinelli, the loan was approved and he received a check in the amount of $60,000. Exposito used the funds to buy other cars that were not pledged as collateral for the loan. He also signed and sealed blank sales contracts and delivered them directly to Mulinelli. Exposito testified that Mulinelli knew the cars referred to in the two loan applications were not in Puerto Rico at the time the loans were made and that he had no intention of selling the cars to Zoom but rather that he intended to use the money to buy other cars. Moreover, Mulinelli determined the terms of these loans, which included large balloon payments at the end of the year. In return for her assistance with the loans, he made a personal loan to

Mulinelli for $5,000 and did some personal favors for her and her family.

## DISCUSSION

### I. The district court's limitation of Mulinelli's cross-examination of López and Exposito

At trial, Mulinelli's counsel cross-examined López regarding the benefits and conditions of his plea agreement. Mulinelli entered into evidence the information by which López was charged and the plea agreement under which he pled guilty to conspiracy to commit bank fraud. Mulinelli elicited testimony from López that he was not and would not be charged with bank fraud, in addition to his conspiracy charge, as Mulinelli had been charged. López also testified that, as part of his plea bargain agreement, the United States Attorney would make a recommendation for a reduction in his sentence. The district court, however, cut off Mulinelli's counsel when on several occasions he tried to elicit testimony from López regarding the possible sentence he faced. The district court noted that matters of sentencing were in the sound discretion of the district court judge who was scheduled to sentence López.

Mulinelli elicited similar testimony from Exposito regarding the substance of the plea agreement—that he expected the United States Attorney to make a recommendation for the district court's consideration in his sentencing, that he was not charged with bank fraud, but only with conspiracy and making a false statement to a financial institution, and that he would not be charged with any other crimes. Again, the district court barred Mulinelli from eliciting testimony regarding the nature of the sentence Exposito expected to receive.

Mulinelli argues on appeal that the district court's limitation on her cross-examination regarding the potential sentence that both accomplices faced before and after entering into the plea agreements so interfered with her ability to effectively cross-examine the witnesses that it violated her Sixth Amendment right to confrontation.

■ The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the ac-

cused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. "[T]he right of a defendant in a criminal case to establish the bias of witnesses against him through cross-examination is an important component of the Sixth Amendment right to confrontation." *United States v. Jarabek*, 726 F.2d 889, 902 (1st Cir.1984) (citing *Davis v. Alaska*, 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1109–10, 39 L.Ed.2d 347 (1974)). A defendant has the right to cross-examine an accomplice regarding the nature of and benefits, including unprosecuted crimes, afforded under the plea agreement. *United States v. Barrett*, 766 F.2d 609, 614 (1st Cir.1985). Although this right is extensive, it is not absolute or unlimited. Once the defendant has been afforded the constitutional minimum of an opportunity for effective cross-examination, the trial court "retain[s] wide latitude to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). "An abuse of discretion has occurred only if the jury is left without 'sufficient information concerning formative events to make a "discriminating appraisal" of a witness's motives and bias.'" *United States v. Twomey*, 806 F.2d 1136, 1140 (1st Cir.1986) (quoting *United States v. Campbell*, 426 F.2d 547, 550 (2d Cir.1970)).

■ We find no such abuse here. During direct and cross–examination of both López and Exposito, the jury was apprised that they were not charged with bank fraud, one of the charges Mulinelli faced. On cross-examination, Mulinelli was able to elicit information regarding their plea agreements, including that the accomplices expected the government to make a beneficial recommendation to the sentencing judge based on their cooperation, and that they were granted immunity from prosecution for any other crimes related to their testimony. The jury could infer from the circumstances that the accomplices had avoided being charged with offenses carrying greater sentences by testi-

fying in the government's case. Mulinelli was able, through her cross-examination, to expose the biases and motivations of the accomplices to favor the government and, once this threshold was met, the district court's limitation was not improper. As we find that the jury had before it sufficient information on which to make a discriminating appraisal of the accomplices' motives and biases, we find no abuse of discretion.

Additionally, Mulinelli's counsel sought to elicit sentencing information regarding the charges the accomplices faced and avoided by pleading guilty to conspiracy. Had Mulinelli successfully elicited this information, the potential punishment she faced, should the jury find her guilty, would have been before the jury. The actions taken by the district court to prevent this information, which could confuse the issues presented to the jury, from reaching the jury were thus entirely proper. *See United States v. Alvarez*, 987 F.2d 77, 82 (1st Cir.1993) (finding the district court did not abuse its discretion when it excluded evidence of the penalty to be imposed on an accomplice as such information might mislead or confuse the jury, "particularly where, as here, the witness sought to testify to the same penalties faced by the defendants").

## II. District court's decision not to allow Jerome Murray to testify

During his cross-examination, López referred to an interview he had prior to the prosecution of this case with an attorney named Jerome Murray ("Murray"). López' trial testimony regarding his interactions with Mulinelli differed from the responses he had given during his interview with Murray, and he stated that he lied during that interview because Murray told him that the purpose of the interview was to "protect" Mulinelli. Defense counsel stated that he wished to have Murray testify to impeach López' testimony that Murray told López that the interview was intended to "protect" Mulinelli. The trial court refused to allow Murray to testify.

■ Murray's testimony would have gone to the question whether López was lying about what Murray had said before the interview, and therefore related to López'

credibility. On appeal, Mulinelli contends that the district court usurped the jury's role in making credibility determinations and thereby abused its discretion. Although the use of contradictory testimony is a valid means of impeachment, it is limited in several important ways. *United States v. Payne*, 102 F.3d 289, 294 (7th Cir.1996). One of these limitations is the collateral issue rule, which bars a party from impeaching a witness on a collateral matter through the use of extrinsic evidence. *United States v. Beauchamp*, 986 F.2d 1, 3 (1st Cir.1993) ("[W]hen a witness testifies to a collateral matter, the examiner 'must take [the] answer,' *i.e.*, the examiner may not disprove it by extrinsic evidence."). "A matter is considered collateral if 'the matter itself is not relevant in the litigation to establish a fact of consequence, *i.e.*, not relevant for a purpose other than mere contradiction of the in-court testimony of the witness.'" *Id.* at 4 (quoting 1 *McCormack on Evidence* § 45, at 169). In other words, "[a] matter is collateral if it could not have been introduced into evidence for any purpose other than contradiction.... [T]he evidence must have an independent purpose and an independent ground for admission." *Payne*, 102 F.3d at 294 (citation and internal quotation marks omitted); *see also United States v. Roulette*, 75 F.3d 418, 423 (8th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 147, 136 L.Ed.2d 93 (1996). The inquiry into what is collateral is squarely within the trial court's discretion. *United States v. Kozinski*, 16 F.3d 795, 806 (7th Cir.1994).

■ In light of the collateral issue rule, in order to be admissible, Murray's offered testimony must not only contradict a statement of López', but must also be material to Mulinelli's guilt or innocence. Mulinelli fails, however, to indicate any independent and material ground for admitting Murray's testimony as to what he told López at the time of the interview. *See Payne*, 102 F.3d at 295 (noting that defendant's proffer for the purpose of impeaching a witness was collateral, as it did not directly relate to substantive issues concerning his guilt or innocence, and therefore was inadmissible); *see also United States v. Zuno–Arce*, 44 F.3d 1420, 1422–23 (9th Cir.) (where accomplices testifying on

behalf of the government presented contradictory testimony, trial court acted within its discretion in determining that "whether they lied, or erred in their perceptions or recollections" were questions of credibility for the jury), *cert. denied*, —— U.S. ——, 116 S.Ct. 383, 133 L.Ed.2d 306 (1995). The district court did not abuse its discretion in excluding Murray's testimony, which was relevant only to López' credibility on a matter immaterial to Mulinelli's guilt.

## III. Evidentiary rulings

### A. Admission of the summary chart

 The government's first witness was Fernando Iglesias Iglesias ("Iglesias"), an auditor for First Federal, whose investigation of First Federal's unusual car loan transactions led to Mulinelli's indictment. During direct examination, the government moved to admit a summary chart that Iglesias had prepared during the course of his investigation, based upon information he gleaned from bank loan records. Mulinelli objected to the admission of the summary chart, arguing that the chart was not an original. On appeal, she changes her position, arguing that the summary chart was not properly qualified under the business record hearsay exception. *See* Fed.R.Evid. 803(6). When a party raises on appeal an argument she failed to present to the district court, she has forfeited the argument and can only obtain a favorable ruling upon a showing of plain error. *See United States v. Smith*, 101 F.3d 202 (1st Cir.1996) (explaining that failure to argue, at time of objection, grounds offered on appeal results in plain error review), *cert. denied*, —— U.S. ——, 117 S.Ct. 1345, 137 L.Ed.2d 503 (1997). Mulinelli must show that the error "resulted in a miscarriage of justice or seriously affected the fairness, integrity or public reputation of the judicial proceedings." *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 189 (1st Cir.) (quotation marks omitted), *cert. denied*, —— U.S. ——, 117 S.Ct. 294, 136 L.Ed.2d 214 (1996). The plain error standard affords reversal "only in 'exceptional cases or under peculiar circumstances to prevent a clear miscarriage of justice.'" *United States v. Griffin*, 818 F.2d 97, 100 (1st Cir.1987). Mulinelli fails to indicate any error in the admission of this summary chart "so shocking that [it] seriously affect[ed] the fundamental fairness and basic integrity of the proceedings below." *Id.* Moreover, the summary chart probably would have been admissible as a business record as the district court would likely find Iglesias a "qualified person" within the meaning of Federal Rule of Evidence 803(6). We find no plain error.

### B. Admission of copy of a check

During the testimony of Iglesias, the government introduced into evidence a microform copy of a check disbursing loan funds to Mulinelli's daughter. Mulinelli objected "only [to] the issue of authenticity," Trial Transcript, Dec. 18, 1995, at 81, of the copy of the check. On appeal, Mulinelli argues that the admission of the microform copy was an abuse of discretion because the government should have introduced the original and because the check was not properly authenticated.

 Regarding the admission of the duplicate, rather than the original, the district court acted well within its discretion. Under Federal Rule of Evidence 1003, "[a] duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." A duplicate is

> a counterpart produced by the same impression as the original, or from the same matrix, or by means of photography, including enlargements and miniatures, or by mechanical or electronic re-recording, or by chemical reproduction, or by other equivalent techniques which accurately reproduces the original.

Fed.R.Evid. 1001(4). The microform copy introduced here was a "duplicate" of the original check and was admissible subject to the limitations of Federal Rule of Evidence 1003. Although Mulinelli objected below to the document's "authenticity" and elicited testimony that the microform was not the original, she failed to elicit any testimony or

make any proffer suggesting that the original had been tampered with or altered in any way and that the copy was not what it purported to be. *See United States v. Balzano*, 687 F.2d 6, 8 (1st Cir.1982) (declining to question authenticity of duplicate where appellant failed to proffer testimony, beyond statement that evidence was not the original, of alteration or tampering). The duplicate complied with the requirements of Federal Rule of Evidence 1003 and was admissible to the same extent as the original. The district court did not abuse its discretion in admitting the microform copy.

■■■ Mulinelli's challenge below as to the "authenticity" of the copy does not clearly identify the argument that the copy was improperly authenticated. Nevertheless, giving Mulinelli the benefit of the doubt as to the scope of her objection below, we review the copy's authentication.[1] Federal Rule of Evidence 901(a) states: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Such authentication can be provided by, among other things, testimony of a custodian or percipient witness or through "the document's '[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.'" *United States v. Holmquist*, 36 F.3d 154, 167 (1st Cir.1994) (quoting Fed. R.Evid. 901(b)(4)). We have recognized that "[i]f the court discerns enough support in the record to warrant a reasonable person in determining that the evidence is what it purports to be, then Rule 901(a) is satisfied and the weight to be given to the evidence is left to the jury." *United States v. Paulino*, 13 F.3d 20, 23 (1st Cir.1994). Iglesias' testimony regarding the conduct of the bank's loan department and surrounding the issuance of this check, which disbursed funds for a fraudulent loan to Mulinelli's daughter, and the characteristics of the check itself, adequately authenticated the copy of the check,

1. Mulinelli directs our attention to three cases that deal with the inadmissibility of evidence under the business records exception to the hearsay rule. *See United States v. Benavente Gómez*, 921 F.2d 378 (1st Cir.1990); *United States v.*

and we find no abuse of discretion in the district court's admission of the copy.

## C. Leading questions

During the government's direct examination of Exposito, Mulinelli's counsel repeatedly objected to the leading nature of the government's questions. Mulinelli restates the objection on appeal, claiming that Exposito was not adverse or hostile to the prosecution so as to warrant leading questions, and that the court's overruling this objection limited her ability to properly cross-examine Exposito because the prosecution, rather than Exposito, was testifying.

■■■ Federal Rule of Evidence 611(c) provides:

> Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony. Ordinarily leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.

"[T]he use of leading questions '. . . must be left to the sound discretion of the trial judge who sees the witness and can, therefore, determine in the interest of truth and justice whether the circumstances justify leading questions to be propounded to a witness by the party producing him.'" *United States v. Brown*, 603 F.2d 1022, 1025 (1st Cir.1979). Our review of the transcript reveals a witness who was, at times, unresponsive or showed a lack of understanding. The prosecutor's use of leading questions was limited to questions intended to lay a foundation for a line of questioning or to assist in developing coherent testimony. We find that such questions were not improper and the district court acted within its discretion when it allowed this manner of questioning. *See id.* at 1025–26.

■■■ Mulinelli also suggests that the district court improperly questioned Exposito

*Kim*, 595 F.2d 755 (D.C.Cir.1979); *United States v. Davis*, 571 F.2d 1354 (5th Cir.1978). As the inadmissibility rulings in these cases relate only to hearsay and not to authentication of evidence, they are inapposite.

during his testimony. The few occasions that Mulinelli points to do not suggest an abuse of discretion. *See United States v. Olmstead,* 832 F.2d 642, 648 (1st Cir.1987). The questions posed by the judge "served to ... clarify lines of inquiry or develop the witness's answer. Such conduct is well within the court's discretion." *Id.*

### D. Limiting cross-examination as irrelevant

In her attack on the prosecutor's use of leading questions, Mulinelli juxtaposes the leeway granted the prosecutor with the district court's curtailment of a line of questioning she sought to pursue. Mulinelli argues that her defense was that Exposito was brought to the bank by one of the bank officers, who vouched for Exposito as creditworthy, and that, thus, Mulinelli relied on the bank officer's support of Exposito. Because of her reliance, Mulinelli argues, she was duped by the two into unknowingly providing fraudulent bank loans to Exposito. Mulinelli argues on appeal that she presented this theory to the jury in her opening statement, but was unable, due to the district court's limitation on her cross-examination of Exposito, to properly present the theory during the course of the trial. The references to this defense during her opening statement consisted of the following, separated by several pages of transcript.

> The evidence will show that Lazaro Exposito was brought to the bank by one of the highest officers of the bank. He did not come in by the regular channels. And the documents that were presented to the car department were brought by this highest officer of the bank. The evidence will show that he was recommended by this highest officer of the bank, and he started to buy repossessed automobiles, which was a department, an office under [Mulinelli] in the department of car loan that was managed or directed by a man named Otero.

> Of course, all under the general supervision of Mulinelli.

\*　　\*　　\*　　\*　　\*　　\*

2. The Assistant United States Attorney.

And finally, I think that the evidence, when you hear it in its totality, you will be convinced that there is a conspiracy of two crooks against María Mulinelli.

Trial Transcript, Dec. 18, 1995, at 26–27, 30.

During Mulinelli's cross-examination of Exposito, the following interchange took place:

Q. Now, sir, you were not brought to First Federal in the usual way other dealers were brought in.

MS. DOMINGUEZ:[2] Objection as to relevance.

MR. ABREU:[3] It's an introductory question.

THE COURT: Well—

MR. ABREU: May I make a proffer?

THE COURT: Why don't you ask him how did he come to the bank to begin with.

Q. (Mr. Abreu) Sir, how did you get to First Federal Savings to the loan department as a dealer?

A. It was through Mr. Alcocer.

Q. Mr. Alcocer was one of the highest officers of the bank at that time, wasn't he?

MS. DOMINGUEZ: Objection as to relevance.

THE COURT: It think it's irrelevant. Sustained.

MR. ABREU: May I make a proffer as to a line?

THE COURT: Well, perhaps you should approach the bench and make a proffer.

(Bench conference.)

MR. ABREU: Your Honor, the proffer is the following: The regular practice in First Federal was sending young people to recruit dealers. In this particular case he came from one of the highest officer[s] of the bank, who collected his information about the corporation to the department. He highly recommended [Exposito], said he had an excellent credit, and that's how he got—that's how they trusted him.

THE COURT: It is total[ly] irrelevant to the issues of this case. This is a very discreet, unique, well-defined conduct that is the object of these charges. Has nothing to do with Mr. Alcocer.

Trial Transcript, Dec. 19, 1995, at 177–78.

3. Mulinelli's counsel.

As we noted above, a defendant has a right to effective cross-examination. *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). Once that constitutional threshold has been met, the trial court "retain[s] wide latitude to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant." *Id.* The question before us is whether the district court judge "exceeded his powers to limit cross-examination." *United States v. Malik*, 928 F.2d 17, 19 (1st Cir.1991). In this case, we find that the district court exceeded the boundaries of its power and deprived Mulinelli of her ability to present her theory of defense to the jury.

 The information presented by Mulinelli in her opening statement and her proffer adequately indicated to the district court the theory of defense she wanted to pursue. She mentioned in her opening statement that "[t]he evidence will show that he (Exposito) was recommended by this highest officer of the bank," which suggests that the person with whom Exposito might have acted to defraud the bank was not Mulinelli, but Alcocer, and at the least that Mulinelli was influenced by the recommendation of Alcocer. Such a theory of defense might suggest that, although Mulinelli may have been negligent in relying on Alcocer's recommendation and not questioning Exposito's loan applications more closely than she did, she had no knowledge of Exposito's fraudulent transactions. The information presented to the district court adequately apprised the court of the relevance of the channels through which Exposito's loans were brought to Mulinelli's attention, and the court, by foreclosing the introduction of *any* testimony to support Mulinelli's theory of defense, violated Mulinelli's Sixth Amendment right to confrontation. We next review this error for harmlessness.

 On direct appeal, we apply the harmless error standard set forth in *Chapman v. California*, which requires that we reverse the conviction unless the government can prove that the constitutional error complained of was "harmless beyond a reasonable doubt." *Chapman*, 386 U.S. 18, 24, 87

S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *see also United States v. Maguire*, 918 F.2d 254, 266 (1st Cir.1990) (ordering a new trial where government failed to show constitutional errors were harmless beyond a reasonable doubt). Under this standard, we may not declare a constitutional error harmless if there is a "reasonable possibility" that the error influenced the verdict. *See United States v. Levy–Cordero*, 67 F.3d 1002, 1015 n.15 (1st Cir.1995) (holding that district court's failure to hold an evidentiary hearing into validity of defendant's proposed defense "was not 'harmless beyond a reasonable doubt' because there is a 'reasonable possibility' that exclusion of the proffered alibi evidence influenced the jury's verdict").

On the particular counts that involved the Exposito transactions, the government's proof of Mulinelli's knowledge relied solely on the testimony of Exposito. While documentary evidence was presented to support Exposito's acquisition of these loans, that evidence did not necessarily corroborate his testimony that Mulinelli encouraged him to apply for the loans or that she set the terms of the loans. The alternative version of events—that Exposito was brought to the bank by the officer and that the officer vouched for him—would not necessarily have contradicted Exposito's testimony on direct examination but would have provided Mulinelli with the opportunity to develop her own theory of defense against these two counts.

 The Sixth Amendment, and thus the constitutional minimum that must be allowed a criminal defendant before a trial court's discretion to limit cross-examination adheres, includes the ability to develop and present a defense. *See United States v. Muhammad*, 928 F.2d 1461, 1467 (7th Cir.1991) (holding that only *after* satisfying the constitutional minimum of allowing a defendant to present sufficient evidence for the jury to assess her theory of defense and witness bias does the district court's discretion to limit cross-examination inure); *see also Washington v. Texas*, 388 U.S. 14, 18, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967) ("'A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense— a right to his day in court—are basic in our system of jurisprudence; and these rights include, as a minimum, a right to

examine the witnesses against him, to offer testimony, and to be represented by counsel.' ") (quoting *In re Oliver*, 333 U.S. 257, 273, 68 S.Ct. 499, 507–08, 92 L.Ed. 682 (1948)). The district court's ruling worked a severe restriction on Mulinelli's ability to elicit evidence relating to her theory of defense. Had the jury been presented with the theory, it may well have accepted it and believed that Exposito's testimony was not credible. As Exposito's testimony was the prosecution's only evidence regarding Mulinelli's knowledge, the error of excluding her theory of defense could not have been harmless, and warrants reversal with regard to the loan transactions with Exposito. We therefore vacate Mulinelli's conviction and sentences [4] on Counts 5 and 6 and remand to the district court for further proceedings in conformity with this decision.

## CONCLUSION

For the foregoing reasons, we *affirm* in part and *vacate* and *remand* in part.

---

4. We note, however, that this outcome will not ultimately change Mulinelli's sentence. Her original base offense level was six, increased eight levels under U.S.S.G. 2F1.1(b)(1) because the loss was determined to be $349,000. The level was further increased two levels in accordance with U.S.S.G. § 2F1.1(b)(2) because the offense involved more than minimal planning and two levels in accordance with U.S.S.G. § 3B1.3 because Mulinelli abused a position of trust. Her sentence, based on these calculations, was 27 months for all six counts, to be served concurrently. The calculations remain the same, even after the loss from Counts 5 and 6 ($130,-000) is excluded, because the district court enhanced for an amount of loss over $200,000 under U.S.S.G. § 2F1.1(b)(1), and the total loss for Counts 1 through 4 remains over $200,000.