USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

Nos. 95-1965
 96-1157

 UNITED STATES,

 Appellee,

 v.

 PATRICK S. CUNAN,

 Defendant, Appellant.

Nos. 96-1156
 97-1865

 UNITED STATES,

 Appellee,

 v.

 PATRICIA A. CUNAN,

 Defendant, Appellant.

 ____________________

 APPEALS FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. William G. Young, U.S. District Judge]

 Before

 Selya, Circuit Judge,
 
 Coffin and Bownes, Senior Circuit Judges.
 
 

 Kevin E. Sharkey with whom Kenna, Johnston & Sharkey was on
brief for appellant Patrick S. Cunan.

 Thomas M. Hoopes, with whom Hoopes and Cronin, and Dana A.
Curhan, were on brief for appellant Patricia A. Cunan.

 Florence Y. Pan, Attorney, United States Department of
Justice, with whom Donald K. Stern, United States Attorney,
District of Massachusetts, was on brief for appellee United States.

August 25, 1998

 
 

 -2- BOWNES, Senior Circuit Judge. In these appeals, Patricia
and Patrick Cunan (husband and wife) challenge their convictions
for conspiracy and laundering of drug money. Patrick was
sentenced to 121 months imprisonment, and Patricia to 60 months
imprisonment, and both were assessed substantial fines. They
allege multiple trial errors, which we address in turn. They also
contend that the imposition of fines was an abuse of discretion. 
We affirm in all respects.
I. 
 Facts
 We recite the facts in the light most favorable to the
verdict. See Glasser v. United States, 315 U.S. 60, 80 (1942). 
From approximately 1982 to 1990, the Cunans were involved in a
variety of financial transactions with Richard DeCato structured to
launder the proceeds from DeCato's extensive marijuana and cocaine
distribution business. DeCato is the ex-husband of Patricia's
sister. The Cunans were never involved in the sale or distribution
of the drugs themselves, and contend that they were unaware that
DeCato's money came from illegal activities.
 Patrick was the owner and president of State Scale
Company, which sells, rents, and services industrial scales. 
Patricia was the office manager of the business, and was
responsible for keeping the books, including the payroll.
 DeCato was arrested in 1981 on charges of possessing
marijuana with intent to distribute. Patrick posted the $10,000.00
bail for DeCato; one year later DeCato fled and became a fugitive. 
During his years as a fugitive, DeCato continued to distribute
drugs. 
 As a fugitive, DeCato was obviously reluctant to open
bank accounts, register motor vehicles, or otherwise establish his
whereabouts to the local authorities. DeCato assumed the name
"Richard Cunan," and represented to numerous individuals that he
was Patrick's brother. Through State Scale, DeCato, inter alia,
received phone messages and mail. He was also given a fake "job"
which allowed him to obtain health insurance for himself and his
common-law wife. State Scale also issued checks to pay federal
income taxes for DeCato. DeCato never actually performed any work
for State Scale, and never received a paycheck. The Cunans also
handled DeCato's child support payments, and wrote checks to
DeCato's tax consultant.
 Most importantly for this case, DeCato laundered money
through State Scale, primarily through the purchase of real estate,
goods, and bars of silver. Typically, DeCato would give cash or
bank checks to the Cunans for them to deposit in their checking
accounts. The amounts deposited were less than $10,000.00, thus
avoiding currency reporting requirements. The Cunans would
contemporaneously write checks to DeCato's creditors. Both Patrick
and Patricia wrote the checks. Patrick usually took title to the
real property. DeCato registered his automobiles as State Scale
vehicles. The silver bars were purchased through Patrick's
investment broker. Some of these transactions were accomplished
through two sham corporations set up by the Cunans, Prestige
Precious Metals and People's United Development Trust. These
transactions were proved primarily with documentary evidence which
established a paper trail between large cash deposits and checks to
cover DeCato's purchases. Appellants paid for DeCato's purchases
with checks, and offset the amounts with cash received from DeCato. 
Many of these transactions corresponded to entries in a ledger
found in DeCato's vehicle when he was arrested in events leading up
to these prosecutions. DeCato's trial on related charges was
severed from appellants'. He pled guilty one week into the
government's case, and did not testify in the appellants' trial.
 Patrick and Patricia raise different issues on appeal. 
Their appeals have been consolidated for purposes of argument and
decision. Patrick also adopts those positions briefed only by
Patricia. See Fed. R. App. P. 28(i). Where such arguments are
transferable, we treat them as such. See United States v. David,
940 F.2d 722, 737 (1st Cir. 1991). 
 II.
 Patricia Cunan
A. The Brady Violation
 The first argument in Patricia's arsenal involves an
alleged violation of Brady v. Maryland, 373 U.S. 83 (1963). In
Brady, the Court held that, 
 suppression by the prosecution of evidence
 favorable to an accused upon request violates
 due process where the evidence is material
 either to guilt or to punishment, irrespective
 of the good faith or bad faith of the
 prosecution. 

 Id. at 87. 
 Patricia's assertion of error is based on the following
facts: Prior to trial, the government indicated that it would call
one Fred Proulx as a witness for the prosecution. His testimony
would be that he also laundered considerable sums through State
Scale by way of a fake "job." Proulx would state that although he
was listed on the State Scale payroll, he did not do work for State
Scale, but instead received paychecks in exchange for cash. 
Specifically, Proulx would testify that on several occasions, he
had personally handed Patricia envelopes containing cash. The
government possessed documentary and other testimonial evidence to
substantiate Proulx's purported testimony. 
 Proulx did not testify at trial, and the government
provided no explanation at the time for its decision not to use him
as a witness. Patricia was, however, cross-examined by means of
pointed and leading questions on whether Proulx had been a
legitimate employee, or instead a money launderer. This cross-
examination was done on the basis of Patricia's direct testimony
that she was unaware of any criminal activity at State Scale
involving DeCato or other individuals. The government also
introduced documentary evidence, which tended to disprove
Patricia's denials. The government introduced some of the
paychecks that Proulx had received from State Scale for cash. They
were significant because they were deposited in groups of five to
ten checks. The government argued that this was evidence that
Proulx was not, in fact, a regular employee, because such deposits
were inconsistent with the actions of a regular working-person, who
would be more apt to deposit paychecks promptly and singly. The
government also introduced Proulx's federal W-2 form, which
fraudulently listed the State Scale business address as his home. 
The Proulx evidence was referred to in the government's closing
argument.
 After trial, as part of the negotiations concerning the
recommendations the government would make at sentencing, the
government asked the Cunans if they had any information which would
explain why Proulx had claimed a memory loss so that he was unable
to testify that he had handed Patricia envelopes of cash. There is
no evidence, however, that Proulx, either then or at any other
time, recanted his story that he had laundered money through State
Scale. 
 Throughout the relevant pre-trial period, the Cunans made
specific and general requests for Brady materials, and renewed
these requests one week before trial. On the basis of the
government's knowledge of Proulx's "memory loss," the Cunans filed
a motion for a new trial, based on Brady, which was denied. 
 Patricia's Brady argument has two components. First, she
alleges a straightforward violation of the government's duty to
disclose potentially exculpable evidence. The second prong of her
Brady argument is more nuanced. Patricia contends that, had she
been aware of Proulx's "memory loss," her objections to the
government's cross-examination and closing argument would have been
successful because she would have been in a better position to
convince the district court that the government possessed no good-
faith basis for probing the Proulx transactions on cross-
examination. Thus, Patricia asserts, her inability to prevent the
Proulx cross-examination questions was a direct result of the
alleged Brady violation. This, she contends, undermines confidence
in the verdict to such an extent that a new trial is warranted.
 The district court ruled that Proulx's memory loss was
not material for Brady purposes because it was not exculpatory, and
there was no means by which the defense could have used it. We
accord this "determination as to the materiality of new evidence
. . . deference." United States v. Perkins, 926 F.2d 1271, 1276
(1st Cir. 1991). The district court also determined that, on the
evidence of record, the government had a sound basis for the cross-
examination and reference to it in closing argument. This
evidentiary determination must also be accorded deference. SeeUnited States v. Barone, 114 F.3d 1284, 1296 (1st Cir.), cert.
denied, 118 S. Ct. 614 (1997). We affirm the district court's
findings and rulings.
 As the Supreme Court's most recent exposition on the
subject states, "[t]he prosecution's affirmative duty to disclose
evidence favorable to a defendant can trace its origins to early
20th-century strictures against misrepresentation." Kyles v.
Whitley, 514 U.S. 419, 432 (1995). The duty, however, is not
absolute. "We do not . . . automatically require a new trial
whenever 'a combing of the prosecutors' files after the trial has
disclosed evidence possibly useful to the defense but not likely to
have changed the verdict . . . .'" Giglio v. United States, 405
U.S. 150, 154 (1972) (quoting United States v. Keogh, 391 F.2d 138,
148 (2d Cir. 1968)). Instead, "[a] finding of materiality of the
evidence is required under Brady." Id. 
 In United States v. Bagley, 473 U.S. 667 (1985), the
Court elaborated a test for determining when undisclosed evidence
is material for purposes of a Brady inquiry. "The evidence is
material only if there is a reasonable probability that, had the
evidence been disclosed to the defense, the result of the
proceeding would have been different." Id. at 682 (opinion of
Blackmun, J.); id. at 685 (White, J., concurring in part and
concurring in judgment); see also Kyles, 514 U.S. at 433-435
(endorsing Bagley test as the proper measure of materiality). This
does not mean that a defendant must convince the court of the
certainty of a different outcome. Instead, one proves a Bradyviolation "by showing that the favorable evidence could reasonably
be taken to put the whole case in such a different light as to
undermine confidence in the verdict." Kyles, 514 U.S. at 435.
 We agree with the district court that the withheld
information in this case was not material for Brady purposes. The
information was simply that Proulx decided that his memory was
insufficient concerning one part of his proposed testimony that
he handed Patricia envelopes containing cash in exchange for
checks. He did not retract his statements that he had laundered
money through State Scale by posing as an "employee." Thus, the
most that the Cunans could have made of the information was exactly
that Proulx had forgotten one aspect of his proposed testimony. 
While impeachment evidence is certainly subject to Bradydisclosure, see Giglio, 405 U.S. at 154, this impeachment evidence
would only have been valuable if Proulx had actually been called as
a witness. In the alternative, Patricia suggests that the Cunans
could have called Proulx themselves. Judge Young aptly stated the
limited value of that course of action. "[A]s a practical matter,
it would be suicidal to call a witness possessed of relevant
inculpatory evidence even though you can impeach your own witnesses
under [Fed. R. Evid.] 607 and say, well, you were going to say
this, but you've forgotten that, haven't you? Thank you very much. 
No defense lawyer would do that."
 With regard to Patricia's second claim of Brady error 
that revelation of the memory loss would have permitted her to
block the cross-examination foray into the Proulx issue we also
agree with the district court. There was a sufficient basis for
the government to ask the questions it posed. Patricia had
testified that she knew of no illegal activity at State Scale, and
the government was in possession of documentary evidence which
suggested otherwise. Proulx had not withdrawn his statements
concerning money laundering, and the documentary evidence supported
his story. This is not, therefore, the situation alleged in
Patricia's brief, that "the government had specific information
that Proulx's earlier allegations were not true." Patricia's Br.
at 44. There was therefore no abuse of discretion in the district
court's decision to permit the cross-examination, and we agree with
the district court that the "memory loss" evidence does not alter
the government's good-faith basis to pursue that questioning. In
the final analysis, our confidence in the verdict is not undermined
by Proulx's "memory loss."
 Related to this issue, Patricia argues that the cross-
examination questions were so pointed, and so leading, as to run
afoul of due process. We disagree. Although the questions were
leading, we do not think they were beyond the bounds of cross-
examination. See Fed. R. Evid. 611(c) (allowing leading questions
on cross-examination). We must note here that the district court
interjected jury instructions during the cross-examination which
explained that the government's questions were not evidence. 
Compare United States v. Cudlitz, 72 F.3d 992, 999 (1st Cir. 1996)
(noting distinction between providing such instructions
contemporaneously as opposed to after the fact).
 Nor do we think it was error for the government to hark
back to the Proulx transactions during its closing argument. The
prosecution argued in closing,
 Ask yourself if Proulx was in fact a full-time
 working man that she testified he was. 
 Depositing six, eight ten checks, weekly
 paychecks, depositing six, eight, ten at a
 time. Or if Proulx was in fact a clear
 example of the same no-show employee status
 that DeCato enjoyed with Patricia Cunan's full
 knowledge and participation.

Defense counsel objected, and the district court declined to issue
any corrective instruction. We detect no error. This was a
permissible recapping of the testimony and evidence on the Proulx
transactions, with the government suggesting the inferences to be
drawn. 
 Finally, we note that Patricia argues in her brief that
because the government's case against her was so weak, compared to
the case against her husband, her allegations of Brady error should
be given more weight. We are unpersuaded. There was considerable
documentary and testimonial evidence implicating Patricia in the
scheme beyond a reasonable doubt.
B. Erroneous Exclusion of Tax Returns
 Patricia next argues that she was denied the opportunity
to present a viable defense when the district court excluded
certain tax returns from two other businesses operated by Patrick. 
She states that these returns would have bolstered her argument
that she was unaware that the money used for the transactions at
issue was coming from an illegitimate source, because the tax
returns reflected other business income that could have funded
Patrick's real estate purchases. In the absence of the documentary
evidence to support her assertions, she argues, the jury was left
only with her statements, and nothing else to support her version
of events.
 The record does not support her contention. At the close
of Patricia's case, her attorney attempted to enter into evidence
tax returns from two businesses, Prestige Realty Trust and P.R.
Realty and Development Corporation. Her counsel conceded at the
time that these documents "would go to the same point as the land
deeds," that being that "there were other corporations that
produced business income." The district court excluded the returns
on the basis that they were cumulative of other evidence already in
the record, and that the returns were overly speculative, "not
linked up with anything." We review this "application of an
evidentiary rule to particular facts ' . . . by an abuse of
discretion standard, which favors the prevailing party.'" Barone,
114 F.3d at 1296 (quoting United States v. Omar, 104 F.3d 519, 522
(1st Cir. 1997)).
 A district court has considerable latitude to restrict
cumulative evidence. See Fed. R. Evid. 403. We do not think the
district court abused its discretion in this instance. As
Patricia's counsel admitted at the time, other documentary evidence
supported Patricia's testimony that Patrick was involved in
legitimate businesses which could have generated the cash flow at
issue. So too, there was testimony from witnesses to support
Patricia's defense. For example, Mrs. Geneva Adams, Patrick's
mother, testified to the existence of P.R. Realty and Development
Corporation. Patricia's contention, that the exclusion of the tax
returns left nothing to corroborate her version of events, rings
hollow. See Hamling v. United States, 418 U.S. 87, 127 (1974)
("The District Court retains considerable latitude even with
admittedly relevant evidence in rejecting that which is cumulative,
and in requiring that which is to be brought to the jury's
attention to be done so in a manner least likely to confuse that
body."). We are satisfied that the district court did not abuse
its discretion in excluding the tax returns.
C. The Fine
 Patricia's final argument concerns the fine imposed upon
her by the district court. Patrick joins in this assertion of
error. Prior to sentencing, the Cunans filed a joint motion to
waive fines. The motion was based upon the self-reported financial
disclosure statements provided to the probation department. In
those statements, the Cunans contend that they have precious little
funds, and are in possession of only their marital home.
 The government introduced evidence to support the request
for substantial fines. Specifically, the government produced a
summary of the Cunans' personal income tax returns. This summary
indicated that the Cunans' interest income had been $116,000 in
1988, and $98,000 in 1989. These were the years just prior to the
scheme's collapse. There was evidence at trial that the Cunans had
lent money to friends and business acquaintances over the years,
with principal amounts outstanding in excess of $1 million. 
Evidence was also before the court which indicated significant land
holdings on the part of the Cunans, above and beyond the land the
government sought forfeited. 
 Under the Sentencing Guidelines, "[t]he court shall
impose a fine in all cases, except where the defendant establishes
that he [or she] is unable to pay and is not likely to become able
to pay any fine." U.S.S.G. 5E1.2. The district court imposed a
fine of $750,000.00 on Patricia, and $2,500,000.00 on Patrick. We
review the imposition of a fine for abuse of discretion. United
States v. Savoie, 985 F.2d 612, 620 (1st Cir. 1993). We detect no
abuse here. 
 "The defendant bears the burden of demonstrating that his
[or her] case warrants an exception to the rule that a fine be
imposed." United States v. Peppe, 80 F.3d 19, 22 (1st Cir. 1996). 
Here the defendants based their entire request for waiver of fines
on self-reported financial disclosure statements. Beyond this, no
attempt was made to rebut the government's compelling evidence that
they had sufficient resources to pay a fine. Because neither
Patrick nor Patricia "establishe[d] that he [or she] is unable to
pay," U.S.S.G. 5E1.2, the district court acted well within its
discretion in imposing the fines.
III. 
 Patrick CunanA. Judicial Bias
 Patrick's first argument concerns what he contends was
misconduct on the part of the trial judge. Specifically, he takes
issue with Judge Young's practice of holding up exhibits for the
government, so that the jury could view the enlargements while the
witness testified. The record indicates that Judge Young did this
regularly, but that he also held up exhibits for the defense during
cross-examination. 
 Patrick asserts he was denied his right to a fair trial
because the practice gave the jury the impression that Judge Young
was acting as the prosecutor's "assistant." Judge Young instructed
the jury that "when we have big things and we have a witness on the
stand, we found that it makes sense and I don't mind doing it,
and I'll do it for everybody if I hold them up, because then
people don't have to get down. It saves time." No objection to
the practice was lodged at the time, and we therefore review for
plain error. See Fed. R. Crim. P. 52(b). "To obtain relief based
on plain error, an appellant must show that the trial judge
committed an error that constituted a '[d]eviation from a legal
rule'; that the error was obvious and 'clear under current law';
and, that the error affected 'substantial rights.'" United Statesv. Bartelho, 129 F.3d 663, 673 (1st Cir. 1997), pet. for cert.
filed, (U.S. June 5, 1998)(No. 98-5442) (quoting United States v.
Olano, 507 U.S. 725, 733-34 (1993)).
 "It is well-established that a judge is not a mere
umpire; he is 'the governor of the trial for the purpose of
assuring its proper conduct,' and has a perfect right albeit a
right that should be exercised with care to participate actively
in the trial proper." Logue v. Dore, 103 F.3d 1040, 1045 (1st Cir.
1997) (quoting Quercia v. United States, 289 U.S. 466, 469 (1933)). 
Our inquiry into whether a trial judge has crossed the line in
claims of this kind focuses on "whether the complaining party can
show serious prejudice." Id. Thus, where the judge participates
actively, "the judge's participation must be balanced; he cannot
become an advocate or otherwise use his judicial powers to
advantage or disadvantage a party unfairly." Id. In the final
analysis, we examine claims of prejudice "according to a standard
of fairness and impartiality, recognizing that each case tends to
be fact-specific." United States v. Polito, 856 F.2d 414, 418 (1st
Cir. 1988) (citations and internal quotation marks omitted). 
 Under these facts, we detect no prejudice, and therefore
no error. First, we find it difficult to understand the argument
that the judge displayed partiality in the course of this conduct
when he also held up exhibits for the defense. Although he was
called upon to do this far more frequently for the government, this
imbalance is not attributable to bias. Instead, it is the result
of the fact that the government's case was document-intensive, and
the appellants' defense was not. Nor do we think the record
supports the argument that this practice conveyed bias to the jury. 
Judge Young was careful to clearly state that this practice was a
courtesy to the witnesses, and was done in the interest of saving
time. Moreover, the jury was instructed about the purpose of the
judge's practice contemporaneously with the first instance of
actual assistance. Thus, if there was the threat of unintended
taint, we think it was effectively muted from the outset. We
therefore do not think the district court's practice deprived
Patrick of a fair trial.
B. The Cross-Examination Errors
 Patrick next asserts that his constitutional right to
effective cross-examination was infringed by the district court's
decision to restrict a certain line of cross-examination on hearsay
grounds. At numerous times during the trial, Patrick's counsel
questioned witnesses on cross-examination as to whether DeCato had
ever told them that he had made $1 million as a result of his
investment in the recovery of silver bars from the shipwreck
"Atocha." The district court consistently sustained the
government's objections, finding that the questions called for
hearsay. Patrick asserts on appeal, as he did in the district
court, that he was not attempting to establish the truth of the
matter asserted that DeCato's funds came from salvaging efforts
 but instead that DeCato had a pattern of misrepresenting to
others that his money came from legitimate sources. It would
follow, then, that DeCato would have used a similar "line" on the
Cunans. Thus, Patrick urges, restriction of this line of cross-
examination so infringed Cunan's rights to present a defense that
a new trial is warranted.
 Patrick's argument is based on United States v.
Mulinelli-Navas, 111 F.3d 983 (1st Cir. 1997), where we reversed a
conviction and remanded for a new trial on the basis of the
district court's refusal to permit certain cross-examination, id.at 993. We reiterated that "[t]he Sixth Amendment, and thus the
constitutional minimum that must be allowed a criminal defendant
before a trial court's discretion to limit cross-examination
adheres, includes the ability to develop and present a defense." 
Id. at 992. Crucial to our decision was the fact that in
Mulinelli, the district court's limitation "foreclos[ed] the
introduction of any testimony to support Mulinelli's theory of
defense." Id. (emphasis in original). 
 Patrick's argument turns initially on whether the
district court's restriction of cross-examination foreclosed his
ability to present this particular defense. We think it did not. 
The record reveals that there was ample evidence generated by the
government's case to support Patrick's theory of defense. Numerous
witnesses testified throughout the trial that DeCato represented to
them that he was either in the construction business, or an
investor in property, or a condominium manager, or a collector of
precious metals. We do not think it particularly relevant that
this evidence came in during the government's direct examination as
opposed to the Cunans' cross-examination. It was testimonial
evidence which directly supported the defense theory. It provided
an evidentiary basis for Patrick to urge the jury to infer that
DeCato had similarly misrepresented the source of his income to the
Cunans. Mulinelli is therefore largely inapposite to this case. 
 Because there was sufficient evidence before the jury
from which to present this defense, the "trial court's discretion
to limit cross-examination adhere[d]." Mulinelli, 111 F.3d at 992. 
The district court ruled that if Patrick wanted to introduce
evidence suggesting that DeCato had made a considerable amount of
money due to his involvement with the "Atocha", he had to do so
with competent evidence, not hearsay. Similarly, the trial court
ruled that if the Cunans wanted to introduce evidence as to what
DeCato had told others about the "Atocha" in order to prove that
"the Cunans thought they were dealing with treasure ship money
rather than drug money," they would first have to show some
communication about the "Atocha" treasure from DeCato to the
Cunans. The court was clear that it would be receptive to such
evidence. We detect no abuse of discretion in the restriction of
cross-examination. 
 In a related vein, Patrick asks us to "note" that the
district court somehow failed to assist Patrick in compelling the
appearance of Mel Fisher, the head of the "Atocha" salvage
operation. At the end of the fifteenth day of trial, the Cunans'
attorney asked the district court what the procedure would be for
compelling the appearance of Fisher. The district court responded
that it would first have to determine whether it had the power to
order Fisher to appear, before holding a hearing on whether to
exercise that power. Patrick takes issue with the district court's
comment, "I rather doubt that I have the power to order someone who
is a resident in Florida [to] present themselves in Massachusetts." 
The next day, however, the Cunans' counsel stated that "we will not
be getting into the Atocha." Accordingly, no hearing was ever
held, and there was no request that Fisher be compelled to appear. 
C. The Willful Blindness Instruction
 Patrick's final assertion of error concerns the giving of
a willful blindness instruction to the jury. Two claims are made. 
First, Patrick alleges that it was error for the court to instruct
on willful blindness at all because there was insufficient evidence
to support the instruction. Because a timely objection was lodged
to the giving of the instruction, we review its propriety for abuse
of discretion. See United States v. Mitchell, 85 F.3d 800, 809
(1st Cir. 1996). Second, Patrick contends that the language of the
instruction was incorrect because it failed to specifically
instruct that mere recklessness or negligence is not enough to
support a finding of willful blindness. Because this specific
assertion of error was not raised below, we review for plain error. 
See United States v. O'Connor, 28 F.3d 218, 221 (1st Cir. 1994).
 With regard to Patrick's first contention, we detect no
abuse of discretion in the district court's decision to instruct on
willful blindness. We stated in United States v. Brandon, 17 F.3d
409, 452 (1st Cir. 1994), that "[t]he trial court may instruct the
jury concerning willful blindness when a defendant claims a lack of
knowledge, the facts support an inference of defendant's conscious
course of deliberate ignorance, and the instruction, taken as a
whole, cannot be misunderstood by a juror as mandating the
inference of knowledge." Patrick argues that when there is an
"absence of evidence showing deliberate acts, on Defendant's part,
aimed at avoidance of actual knowledge, then the willful blindness
instruction should not be given." Patrick's Br. at 27. But this
is not the law. All that is required is that "the facts support an
inference of defendant's conscious course of deliberate ignorance." 
Brandon, 17 F.3d at 452 (emphasis added).
 We think the facts of this case sufficiently supported
the inferences necessary to permit the district court to instruct
on willful blindness. There was evidence which tended to show that
the Cunans were closely involved with DeCato's extensive purchases,
and were aware that he was purchasing goods and property under
false names. There was also evidence that they knew that he was a
fugitive from a drug trafficking charge, yet accepted large amounts
of cash from DeCato, turning that cash into checks for his
purchases. In the face of this, they adamantly maintain that they
did not know DeCato's funds came from drug trafficking. This
evidence supports an inference of conscious avoidance. See United
States v. Gabriele, 63 F.3d 61, 66-67 (1st Cir. 1995) (finding
similar "red flags" of criminal activity sufficient to support
instruction).
 Turning to Patrick's second assertion, we detect no plain
error. The district court's instruction was as follows:
 [Y]ou may infer that a person had knowledge
 from circumstantial evidence or evidence
 showing willful blindness by that person. 
 Willful blindness exists when a person, whose
 suspicion has been aroused deliberately fails
 to make further inquiries. If you find that a
 person had a strong suspicion and someone
 withheld important facts, yet shut his or her
 eyes for fear of what he or she would learn,
 you may conclude that the person acted
 knowingly. 

Patrick asserts that this instruction should have included a
statement that mere recklessness or negligence is not enough to
support a finding of willful blindness. He is correct that our
recent decisions on the issue have approved instructions that
included such language. See, e.g., Brandon, 17 F.3d at 452 n.72;
United States v. Richardson, 14 F.3d 666, 671 (1st Cir. 1994). We
stated in Brandon that "[t]he danger of an improper willful
blindness instruction is the possibility that the jury will be led
to employ a negligence standard and convict a defendant on the
impermissible ground that he should have known an illegal act was
taking place." 17 F.3d at 453 (internal quotation marks and
alterations omitted); see also First Circuit Pattern Jury
Instructions Criminal 2.14 (West 1998). But we think the
instruction at issue was adequately worded to avoid such a danger. 
The instruction speaks of conscious acts of avoidance 
"deliberately fails to make further inquiries," "shut his or her
eyes." This language conveys the proper standard to apply in
assessing the Cunans' conduct, and fairly read, does not suggest
that anything less will suffice. We therefore find no plain error.
 As a final note, we do not understand Patrick's
contention that the district court failed to instruct the jury that
it must find willful blindness beyond a reasonable doubt. The
record demonstrates that the court instructed the jury that the
government must prove the knowledge element of the offense beyond
a reasonable doubt, before outlining the ways in which the
knowledge element could be satisfied, including willful blindness. 
 IV. 
 Based on the record and the law, we are confident that
both appellants received a fair trial. The judgments below are
AFFIRMED.