USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 95-1271 UNITED STATES OF AMERICA, Appellee, v. SOHIEL OMAR, a/k/a SAM OMAR, Defendant, Appellant. ____________________ No. 95-1272 UNITED STATES OF AMERICA, Appellee, v. BURTON A. FERRARA, Defendant, Appellant. ____________________ ERRATA SHEET ERRATA SHEET The opinion of this court issued January 23, 1997, should be amended as follows: On page 9, line 6, replace "(1990)" with "(1st Cir. 1990)". UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 95-1271 UNITED STATES OF AMERICA, Appellee, v. SOHIEL OMAR, a/k/a SAM OMAR, Defendant, Appellant. ____________________ No. 95-1272 UNITED STATES OF AMERICA, Appellee, v. BURTON A. FERRARA, Defendant, Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Richard G. Stearns, U.S. District Judge] ___________________ ____________________ Before Cyr, Boudin and Stahl, Circuit Judges ______________ ____________________ Stephen Hrones, by Appointment of the Court, with whom Michael A. ______________ __________ Goldsmith and Hrones & Garrity were on consolidated brief for _________ __________________ appellants. Timothy Q. Feeley, Assistant United States Attorney, with whom __________________ Donald K. Stern, United States Attorney, and James F. Lang, Assistant ________________ _____________ United States Attorney, were on consolidated brief for the United States. ____________________ January 23, 1997 ____________________ BOUDIN, Circuit Judge. Burton Ferrara and Sohiel Omar ______________ appeal from their convictions for bank larceny, money laundering and conspiracy. The single issue is whether the district court erred in excluding, over the defendants' objection, grand jury testimony of a witness who had died prior to the trial. The issue turns on the application of the hearsay exception for "former testimony." Fed. R. Evid. 804(b)(1).  On March 27, 1991, a Brinks armored truck making deliveries in Boston was robbed of about $900,000. The truck was found in nearby Somerville with the money missing and the driver, Burton Ferrara, handcuffed in the rear compartment. Ferrara told police that he had been hijacked in Boston by a gunman who, while Ferrara was parked on the street awaiting the return of messengers, stuck a gun through a portal (actually a gunport) in the driver's compartment and forced Ferrara to open the door.  After an extensive investigation, the authorities concluded that the robbery had been carried out by Ferrara and his friend Sohiel Omar. In February 1994, almost three years after the robbery, a federal grand jury indicted Ferrara and Omar, charging them with bank larceny, money laundering the stolen funds, and conspiracy to commit those substantive offenses. 18 U.S.C. 371, 1956(a)(1)(B)(i), -2- -2- 2113(b). The defendants were tried by a jury in October and November of 1994. At trial, the government's evidence was extensive but, with one exception, largely circumstantial. Its witnesses testified that prior to the robbery, Ferrara and Omar were friends and former co-workers at an automobile dealership. In 1990, they had sought to renovate a house in South Boston but had fallen into financial difficulties, and were unable to pay their contractors. Ferrara then obtained a job as a Brinks driver and began work in March 1991 on a regular run; messengers accompanied him to deliver the cash from the truck. The robbery occurred about three weeks later. The government also offered evidence that the portal, through which the assailant's gun had allegedly been thrust, was closed when the messengers had left the truck. It was shown that the portal cover--easily controllable from the inside--could be opened from the outside only with time, tools and effort. Two witnesses said that there were no scratch-marks outside the portal. The jury could thus have regarded Ferrara's version of events as doubtful. More damaging was testimony from contractors that beginning soon after the robbery, Ferrara and Omar began to pay them with large sums--the first payment was $5,200--in cash and new bills, some with serial numbers almost in sequential order. Much of the money was shown to derive from -3- -3- Federal Reserve shipments to the bank whose cash was in Ferrara's truck on the day of the robbery. After the robbery, Ferrara also bought money orders and made payments to others.  One of the contractors testified that he told Omar that he preferred to be paid by check; Omar paid the next installments with checks drawn on the account of Lee Services, a defunct trash hauling firm. Lee Najarian was the bookkeeper for Lee Services. In 1991, Najarian was living with Raymond Femino, who was the proprietor of Lee Services and a friend of Omar. Najarian's evidence at the trial was especially damning and led directly to the ruling that provoked this appeal. Testifying at trial under a grant of immunity, Najarian told the jury that she remembered Omar bringing a large green trash bag to her home on the night of the robbery, and that Femino later showed her that the bag was filled with stacked bundles of cash. She testified further that Omar had regularly returned during the spring of 1991 to retrieve cash and that she had put some of the money in the Lee Services bank account and written checks to Omar and one of his contractors. Finally, Najarian testified that she had heard Omar boasting that he had worn a ski mask and had stuck a gun into the truck and had taken the money out of the truck and thrown -4- -4- it in his car. According to Najarian, Omar also said that he had buried some of the money. Najarian also said that Omar had implicated "Burt"--a likely reference to Ferrara--in the robbery. In cross-examining Najarian, the defense brought out the fact that she had given contrary testimony to a grand jury in August 1993; on that occasion, Najarian had generally denied any pertinent knowledge of the Brinks robbery and had not disclosed Omar's delivery of cash or his admissions. After entering into a written immunity agreement with the government, Najarian testified again to the grand jury in January 1994. This time she gave testimony similar to her later trial testimony. As part of its own case, the defense sought to undermine Najarian's testimony further by introducing a portion of Femino's grand jury testimony. Femino had testified for about 10 to 20 minutes at an earlier grand jury session in November 1991. There, while being questioned on other aspects of the case, he briefly but flatly denied receiving money from Omar, either in a trash bag or otherwise, and denied putting cash for Omar into bank accounts.  Because Femino died in 1993, he was unavailable for trial. The defense sought to offer his prior grand jury testimony under Fed. R. Evid. 804(b)(1) which--where the -5- -5- declarant is unavailable--permits as evidence in a criminal trial prior [t]estimony given [by the declarant] as a witness at another hearing of the same or different proceeding . . . if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.  The district court excluded Femino's grand jury testimony on the ground that the government did not have a "similar motive" in November 1991 to develop Femino's testimony. The jury ultimately convicted Ferrara and Omar on all counts. The district court later sentenced each defendant to 48 months in prison, three years of supervised release, and restitution in the amount of $908,750. On this appeal, which has been ably briefed by both sides, the only question presented is whether it was error and, if so, prejudicial error, to exclude Femino's grand jury testimony. If the exclusion of Femino's testimony clearly could not have made a difference, we would dispose of the case on that ground, but we think that this course is not readily available. Whether a mistaken evidentiary ruling is harmless depends, in the ordinary case, primarily on the likelihood that it did or did not affect the jury. This in turn hinges both upon the evidence at issue and on the weight of the ___ other evidence in the case. See Rossetti v. Curran, 80 F.3d ___ ________ ______ 1, 6-7 (1st Cir. 1996). -6- -6- It is true, in the government's favor, that Femino's grand jury testimony was not especially credible. That small piece of the testimony that helped the defendants and contradicted Najarian was brief, lacking in corroborative detail and highly self-serving (since Femino had no immunity). Other testimony at trial suggested that Femino was drug addicted, an alcoholic, and a seller of drugs, making his boilerplate denials in the grand jury even less likely to be credited. On the other hand, the government's case was largely circumstantial. Najarian's testimony about the bag of cash may not have been essential, but it was very helpful in making the circumstantial case fit together tightly, by describing how the money was conveyed to Femino. Najarian also testified to Omar's alleged incriminating admissions. The government says that the defendants were able to impeach Najarian with her own original grand jury testimony; but a little thought suggests that this argument cuts both ways. A fairly strong case against both defendants would have been much weaker if Najarian's testimony had been disbelieved. Of course, Najarian's testimony had other support while Femino's grand jury denials were brief and self-serving. But, together with Najarian's own grand jury perjury (one of her two versions was false), Femino's denials could have helped to raise a reasonable doubt for the jury as -7- -7- to both defendants. In sum, the exclusion of the grand jury testimony was not clearly harmless; whether it was error is a different matter. In addressing the merits, we begin with a general issue of law--how to construe Rule 804(b)(1)--which is subject to de novo review. But in considering the application of the ________ rule to particular facts, the district court's ruling is normally tested by an "abuse of discretion" standard, which favors the prevailing party. United States v. Lombard, 72 _____________ _______ F.3d 170, 187 (1st Cir. 1995), appeal after remand, 102 F.3d ___________________ 1 (1st Cir. 1996). And, the evidence in question being hearsay, it was the defendants' burden to prove each element of the exception they invoked. Cf. United States v. ___ ______________ Sepulveda, 15 F.3d 1161, 1180 (1st Cir. 1993), cert. denied, _________ _____ ______ 114 S. Ct. 2714 (1994). Turning to Rule 804(b)(1), we think that this hearsay exception for prior testimony does extend, where all its conditions are met, to grand jury testimony taken at the government's behest and later offered against it in a criminal trial. A grand jury proceeding can be regarded as a "hearing," especially in the context of a rule that applies as well to depositions. And--assuming "an opportunity and similar motive to develop the testimony"--the rationale for an exception to the hearsay rule is made out, namely, that the party against whom the testimony is now offered earlier -8- -8- had the opportunity and similar motive to discredit the testimony, and so did then whatever it would do now if the declarant were on the stand. It is unclear whether Rule 804(b)(1) is intended to apply where the present opponent of the evidence had no prior motive to discredit the testimony but instead sponsored it in the earlier proceeding as worthy of belief. In such a case, the rationale for a hearsay exception would be quite different, namely, a kind of quasi-estoppel.1 Arguably, the motive to develop would not be "similar" in the second case, so the rule would not apply. As we will see, even a broader view of the rule would not alter the result here. In all events, in United States v. Donlon, 909 F.2d 650, _____________ ______ 654 (1st Cir. 1990), this court said that the prior-testimony exception did not apply at all to grand jury testimony. Whether or not this was dictum, Donlon's statement cannot ______ stand against the Supreme Court's own decision two years later in United States v. Salerno, 505 U.S. 317 (1992). ______________ _______ There, the Supreme Court all but held that Rule 804(b)(1) could embrace grand jury testimony; and on remand the Second  ____________________ 1The advisory committee note on Rule 804(b)(1) leaves the matter in confusion. It describes the estoppel rationale as archaic but then, instead of flatly rejecting it, shifts the discussion to the proposition that in the case of an adverse witness, the direct and redirect examination of one's own witness can be the equivalent of the cross-examination of an opponent's witness. -9- -9- Circuit took the same view of the matter. United States v. _____________ Dinapoli, 8 F.3d 909, 914 (2d Cir. 1993) (en banc). ________ _______ There has been confusion on this issue in the circuits. No one knows whether the drafters of the rule had grand jury proceedings in mind. In fact, it is likely to be very difficult for defendants offering grand jury testimony to satisfy the "opportunity and similar motive" test; and the reasons why this is so probably underlie the doubts courts have expressed as to whether the rule should ever apply to grand jury testimony. E.g., United States v. Dent, 984 F.2d ____ _____________ ____ 1453, 1462 (7th Cir.), cert. denied, 510 U.S. 858 (1993). ____________ But the government concedes that it could in principle apply and (yielding to Salerno) we agree, if and when the quoted _______ condition is met.  This concession by the United States is not meant to stretch very far. The government's bedrock position is that the prosecution ordinarily does not in a grand jury ___ proceeding have the kind of motive to develop testimony that it would in an ordinary trial or that is required to meet the express test and rationale of Rule 804(b)(1). And, it says, in this case the prosecutor at the grand jury stage lacked the requisite "similar motive" as to Femino's testimony. We agree provisionally with the former proposition and completely with the latter. -10- -10- In an ordinary trial, the positions of the parties vis- a- vis a witness are likely to be clear-cut: the witness is normally presented by one side to advance its case and cross- examined by the other to discredit the testimony. Each side usually has reason to treat the trial as a last chance with the witness. If a new trial later becomes necessary and the witness proves unavailable, it may be a fair guess that each side has already done at the original trial all that the party would do if the declarant were now present for a new trial.  Grand juries present a different face. Often, the government neither aims to discredit the witness nor to vouch for him. The prosecutor may want to secure a small piece of evidence as part of an ongoing investigation or to compel an answer by an unwilling witness or to "freeze" the position of an adverse witness. In particular, discrediting a grand jury witness is rarely essential, because the government has a modest burden of proof, selects its own witnesses, and can usually call more of them at its leisure. In the case at hand, we think that it is fair to apply the "opportunity and similar motive" test to the specific portion of the testimony at issue; there might be a motive to develop some testimony of a witness but not other parts. Cf. ___ Williamson v. United States, 114 S. Ct. 2431, 2434-36 (1994). __________ _____________ Here, our focus is upon Femino's exculpatory denial. And our -11- -11- main concern is whether, in the prior proceeding, the government (the party against whom the testimony is now offered) had "an opportunity and similar motive" to undermine it. There is no indication that the government had any evidence available in November 1991 with which to confront and contradict Femino when he denied receiving the cash from the defendants. Najarian was still denying any knowledge of the matter in August 1993 in her own grand jury testimony. Not until November 1994, in an interview with an FBI agent, did Najarian change her story and begin to cooperate. Thus, it is arguable that the government had no meaningful opportunity to discredit Femino at the time.2 In any case, it certainly lacked any evident motive to do so. If the government had had Najarian's cooperation in 1991, it could well have preferred to keep it secret from Femino. The prosecutor might have wished to protect a key witness for the time being or to bargain later with Femino, armed with a perjury charge against him. Given the other evidence against the defendants, the government surely had no reason to fear that Femino's terse denials, if he were not  ____________________ 2Just how equivalent the "opportunity" need be is not made clear by the rule or advisory committee note. There are obviously issues of degree and may be other variables (like fault) that bear upon the answer, which is probably best left to case-by-case development. Compare United States v. Koon, _______ _____________ ____ 34 F.2d 1416, 1427 (9th Cir. 1994), rev'd on other grounds, _______________________ 116 S. Ct. 2035 (1996).  -12- -12- directly confronted, would lead the grand jury to refuse to indict. The outcome is the same even if we assume dubitante that _________ a party who previously sponsored a witness could be deemed to have a "similar motive" when later opposing the testimony. The government has never had any reason to "develop" Femino's exculpatory denial as worthy of belief. In the grand jury, the government called Femino to elicit testimony on several other points; the prosecutor seems to have asked about cash from the defendants simply to lock the witness into a firm position or to make clear to the grand jury that all reasonable questions had been asked. An argument can certainly be made that the fairest outcome here would be to admit Femino's exculpatory statement. His grand jury testimony was important to the defendants on this issue; it was pure happenstance that he died and was not available at trial (although he might have refused to testify). And while his testimony was self- serving and suspect, the government's ability to undermine it at trial, through Najarian, was substantial even without having Femino to cross-examine. Conflicts between rule and equity are common. If every ruling is ad hoc, it is hard to implement policy and predict ______ outcomes. And rules themselves are debatable: one respected evidence code proposed that "hearsay . . . is admissible if . -13- -13- . . the declarant . . . is unavailable." ALI, Model Code of _____________ Evidence Rule 503 (1942). But our own federal rules stop ________ with a broad catch-all exception for hearsay supported by "circumstantial guarantees of trustworthiness." Fed. R. Evid. 803(24), 804(b)(5).  In this case, the defendants did not invoke this exception, probably believing that they could not show that Femino's self-serving denials were trustworthy. Thus viewed, the defendants were deprived of helpful but not very credible evidence which--for this very reason--might well not have been given great weight by the jury, quite apart from other evidence tending to corroborate Najarian's story. In all events, the exclusion of the evidence was consistent with Rule 804(b)(1). Affirmed. ________ -14- -14-