**UNITED STATES, Appellee,**

v.

**Patrick S. CUNAN, Defendant, Appellant.**

**UNITED STATES, Appellee,**

v.

**Patricia A. CUNAN, Defendant, Appellant.**

**Nos. 95–1965, 96–1157, 96–1156 and 97–1865.**

United States Court of Appeals, First Circuit.

Heard May 5, 1998.

Decided Aug. 25, 1998.

---

Kevin E. Sharkey with whom Kenna, Johnston & Sharkey was onbrief for appellant Patrick S. Cunan.

Thomas M. Hoopes, with whom Hoopes and Cronin, and Dana A. Curhan, were on brief for appellant Patricia A. Cunan.

Florence Y. Pan, Attorney, United States Department of Justice, with whom Donald K. Stern, United States Attorney, District of Massachusetts, was on brief for appellee United States.

Before SELYA, Circuit Judge, COFFIN and BOWNES, Senior Circuit Judges.

BOWNES, Senior Circuit Judge.

In these appeals, Patricia and Patrick Cunan (husband and wife) challenge their convictions for conspiracy and laundering of drug money.[1] Patrick was sentenced to 121 months imprisonment, and Patricia to 60 months imprisonment, and both were assessed substantial fines. They allege multiple trial errors, which we address in turn. They also contend that the imposition of fines was an abuse of discretion. We affirm in all respects.

## I.

### Facts

We recite the facts in the light most favorable to the verdict. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). From approximately 1982 to 1990, the Cunans were involved in a variety of financial transactions with Richard DeCato structured to launder the proceeds from DeCato's extensive marijuana and cocaine distribution business. DeCato is the ex-husband of Patricia's sister. The Cunans were never involved in the sale or distribution of the drugs themselves, and contend that they were unaware that DeCato's money came from illegal activities.

Patrick was the owner and president of State Scale Company, which sells, rents, and services industrial scales. Patricia was the office manager of the business, and was responsible for keeping the books, including the payroll.

DeCato was arrested in 1981 on charges of possessing marijuana with intent to distribute. Patrick posted the $10,000.00 bail for DeCato; one year later DeCato fled and became a fugitive. During his years as a fugitive, DeCato continued to distribute drugs.

As a fugitive, DeCato was obviously reluctant to open bank accounts, register motor vehicles, or otherwise establish his whereabouts to the local authorities. DeCato assumed the name "Richard Cunan," and represented to numerous individuals that he was Patrick's brother. Through State Scale, DeCato, *inter alia*, received phone messages and mail. He was also given a fake "job" which allowed him to obtain health insurance for himself and his common-law wife. State Scale also issued checks to pay federal income taxes for DeCato. DeCato never actually performed any work for State Scale, and never received a paycheck. The Cunans also handled DeCato's child support payments, and wrote checks to DeCato's tax consultant.

Most importantly for this case, DeCato laundered money through State Scale, primarily through the purchase of real estate, goods, and bars of silver. Typically, DeCato would give cash or bank checks to the Cunans for them to deposit in their checking accounts. The amounts deposited were less than $10,000.00, thus avoiding currency re-

---

1. We usually reference parties on appeal by last names. That poses obvious problems in the instant case, and we therefore refer to the appellants, when distinguishing between them, by their first names.

porting requirements. The Cunans would contemporaneously write checks to DeCato's creditors. Both Patrick and Patricia wrote the checks. Patrick usually took title to the real property. DeCato registered his automobiles as State Scale vehicles. The silver bars were purchased through Patrick's investment broker. Some of these transactions were accomplished through two sham corporations set up by the Cunans, Prestige Precious Metals and People's United Development Trust. These transactions were proved primarily with documentary evidence which established a paper trail between large cash deposits and checks to cover DeCato's purchases. Appellants paid for DeCato's purchases with checks, and offset the amounts with cash received from DeCato. Many of these transactions corresponded to entries in a ledger found in DeCato's vehicle when he was arrested in events leading up to these prosecutions. DeCato's trial on related charges was severed from appellants'. He pled guilty one week into the government's case, and did not testify in the appellants' trial.

Patrick and Patricia raise different issues on appeal. Their appeals have been consolidated for purposes of argument and decision. Patrick also adopts those positions briefed only by Patricia. *See* Fed. R.App. P. 28(i). Where such arguments are transferable, we treat them as such. *See United States v. David,* 940 F.2d 722, 737 (1st Cir.1991).

## II.

### Patricia Cunan

#### A. *The Brady Violation*

The first argument in Patricia's arsenal involves an alleged violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In *Brady,* the Court held that,

> suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment,

irrespective of the good faith or bad faith of the prosecution.

*Id.* at 87, 83 S.Ct. 1194.

Patricia's assertion of error is based on the following facts: Prior to trial, the government indicated that it would call one Fred Proulx as a witness for the prosecution. His testimony would be that he also laundered considerable sums through State Scale by way of a fake "job." Proulx would state that although he was listed on the State Scale payroll, he did not do work for State Scale, but instead received paychecks in exchange for cash. Specifically, Proulx would testify that on several occasions, he had personally handed Patricia envelopes containing cash. The government possessed documentary and other testimonial evidence to substantiate Proulx's purported testimony.

Proulx did not testify at trial, and the government provided no explanation at the time for its decision not to use him as a witness. Patricia was, however, cross-examined by means of pointed and leading questions on whether Proulx had been a legitimate employee, or instead a money launderer. This cross-examination was done on the basis of Patricia's direct testimony that she was unaware of any criminal activity at State Scale involving DeCato or other individuals. The government also introduced documentary evidence, which tended to disprove Patricia's denials. The government introduced some of the paychecks that Proulx had received from State Scale for cash. They were significant because they were deposited in groups of five to ten checks. The government argued that this was evidence that Proulx was not, in fact, a regular employee, because such deposits were inconsistent with the actions of a regular working-person, who would be more apt to deposit paychecks promptly and singly. The government also introduced Proulx's federal W–2 form, which fraudulently listed the State Scale business address as his home. The Proulx evidence was referred to in the government's closing argument.

After trial, as part of the negotiations concerning the recommendations the government would make at sentencing, the govern-

ment asked the Cunans if they had any information which would explain why Proulx had claimed a memory loss so that he was unable to testify that he had handed Patricia envelopes of cash. There is no evidence, however, that Proulx, either then or at any other time, recanted his story that he had laundered money through State Scale.[2]

Throughout the relevant pre-trial period, the Cunans made specific and general requests for *Brady* materials, and renewed these requests one week before trial. On the basis of the government's knowledge of Proulx's "memory loss," the Cunans filed a motion for a new trial, based on *Brady*, which was denied.

■ Patricia's *Brady* argument has two components. First, she alleges a straightforward violation of the government's duty to disclose potentially exculpable evidence. The second prong of her *Brady* argument is more nuanced. Patricia contends that, had she been aware of Proulx's "memory loss," her objections to the government's cross-examination and closing argument would have been successful because she would have been in a better position to convince the district court that the government possessed no good-faith basis for probing the Proulx transactions on cross-examination. Thus, Patricia asserts, her inability to prevent the Proulx cross-examination questions was a direct result of the alleged *Brady* violation. This, she contends, undermines confidence in the verdict to such an extent that a new trial is warranted.

■ The district court ruled that Proulx's memory loss was not material for *Brady* purposes because it was not exculpatory, and there was no means by which the defense could have used it. We accord this "determination as to the materiality of new evidence ... deference." *United States v. Perkins,* 926 F.2d 1271, 1276 (1st Cir.1991). The district court also determined that, on the evidence of record, the government had a sound basis for the cross-examination and reference to it in closing argument. This evidentiary determination must also be ac-

corded deference. *See United States v. Barone,* 114 F.3d 1284, 1296 (1st Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 614, 139 L.Ed.2d 500 (1997). We affirm the district court's findings and rulings.

■ As the Supreme Court's most recent exposition on the subject states, "[t]he prosecution's affirmative duty to disclose evidence favorable to a defendant can trace its origins to early 20th-century strictures against misrepresentation." *Kyles v. Whitley,* 514 U.S. 419, 432, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). The duty, however, is not absolute. "We do not ... automatically require a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict....'" *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (quoting *United States v. Keogh,* 391 F.2d 138, 148 (2d Cir. 1968)). Instead, "[a] finding of materiality of the evidence is required under *Brady.*" *Id.*

■ In *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Court elaborated a test for determining when undisclosed evidence is material for purposes of a *Brady* inquiry. "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682, 105 S.Ct. 3375 (opinion of Blackmun, J.); *id.* at 685, 105 S.Ct. 3375 (White, J., concurring in part and concurring in judgment); *see also Kyles,* 514 U.S. at 433–435, 115 S.Ct. 1555 (endorsing *Bagley* test as the proper measure of materiality). This does not mean that a defendant must convince the court of the certainty of a different outcome. Instead, one proves a *Brady* violation "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles,* 514 U.S. at 435, 115 S.Ct. 1555.

---

2. The parties agreed at the hearing on the motion for a new trial that this situation deals with a partial memory loss of one particular fact

(handing Patricia envelopes of cash for checks), and not a substantive retraction of Proulx's tale of money laundering.

■ We agree with the district court that the withheld information in this case was not material for *Brady* purposes. The information was simply that Proulx decided that his memory was insufficient concerning one part of his proposed testimony—that he handed Patricia envelopes containing cash in exchange for checks. He did not retract his statements that he had laundered money through State Scale by posing as an "employee." Thus, the most that the Cunans could have made of the information was exactly that—Proulx had forgotten *one aspect* of his proposed testimony. While impeachment evidence is certainly subject to *Brady* disclosure, *see Giglio,* 405 U.S. at 154, 92 S.Ct. 763, this impeachment evidence would only have been valuable if Proulx had actually been called as a witness. In the alternative, Patricia suggests that the Cunans could have called Proulx themselves. Judge Young aptly stated the limited value of that course of action. "[A]s a practical matter, it would be suicidal to call a witness possessed of relevant inculpatory evidence even though you can impeach your own witnesses under [Fed. R.Evid.] 607 and say, well, you were going to say this, but you've forgotten that, haven't you? Thank you very much. No defense lawyer would do that."

■ With regard to Patricia's second claim of *Brady* error—that revelation of the memory loss would have permitted her to block the cross-examination foray into the Proulx issue—we also agree with the district court. There was a sufficient basis for the government to ask the questions it posed. Patricia had testified that she knew of no illegal activity at State Scale, and the government was in possession of documentary evidence which suggested otherwise. Proulx had not withdrawn his statements concerning money laundering, and the documentary evidence supported his story. This is not, therefore, the situation alleged in Patricia's brief, that "the government had specific information that Proulx's earlier allegations were not true." Patricia's Br. at 44. There was therefore no abuse of discretion in the district court's decision to permit the cross-examination, and we agree with the district court that the "memory loss" evidence does not alter the government's good-faith basis to pursue that questioning. In the final analysis, our confidence in the verdict is not undermined by Proulx's "memory loss."

Related to this issue, Patricia argues that the cross-examination questions were so pointed, and so leading, as to run afoul of due process. We disagree. Although the questions were leading,[3] we do not think they were beyond the bounds of cross-examination. *See* Fed.R.Evid. 611(c) (allowing leading questions on cross-examination). We must note here that the district court interjected jury instructions *during* the cross-examination which explained that the government's questions were not evidence. *Compare United States v. Cudlitz,* 72 F.3d 992, 999 (1st Cir.1996) (noting distinction between providing such instructions contemporaneously as opposed to after the fact).

■ Nor do we think it was error for the government to hark back to the Proulx transactions during its closing argument. The prosecution argued in closing,

> Ask yourself if Proulx was in fact a full-time working man that she testified he was. Depositing six, eight ten checks, weekly paychecks, depositing six, eight, ten at a time. Or if Proulx was in fact a clear example of the same no-show employee status that DeCato enjoyed with Patricia Cunan's full knowledge and participation.

Defense counsel objected, and the district court declined to issue any corrective instruction. We detect no error. This was a permissible recapping of the testimony and evidence on the Proulx transactions, with the government suggesting the inferences to be drawn.

■ Finally, we note that Patricia argues in her brief that because the government's case against her was so weak, compared to the case against her husband, her allegations of *Brady* error should be given more weight.

---

**3.** One example of the typical question follows. "Q: And in fact, Mr. Proulx left and never came back except to pick up paychecks because he wasn't working for State Scale at all; isn't that true? A: No, he worked for us."

We are unpersuaded. There was considerable documentary and testimonial evidence implicating Patricia in the scheme beyond a reasonable doubt.[4]

### B. *Erroneous Exclusion of Tax Returns*

■ Patricia next argues that she was denied the opportunity to present a viable defense when the district court excluded certain tax returns from two other businesses operated by Patrick. She states that these returns would have bolstered her argument that she was unaware that the money used for the transactions at issue was coming from an illegitimate source, because the tax returns reflected other business income that could have funded Patrick's real estate purchases. In the absence of the documentary evidence to support her assertions, she argues, the jury was left only with her statements, and nothing else to support her version of events.

■ The record does not support her contention. At the close of Patricia's case, her attorney attempted to enter into evidence tax returns from two businesses, Prestige Realty Trust and P.R. Realty and Development Corporation. Her counsel conceded at the time that these documents "would go to the same point as the land deeds," that being that "there were other corporations that produced business income." The district court excluded the returns on the basis that they were cumulative of other evidence already in the record, and that the returns were overly speculative, "not linked up with anything."[5] We review this "application of an evidentiary rule to particular facts ' ... by an abuse of discretion standard, which favors the prevailing party.'" *Barone*, 114 F.3d at 1296 (quoting *United States v. Omar*, 104 F.3d 519, 522 (1st Cir.1997)).

A district court has considerable latitude to restrict cumulative evidence. *See* Fed. R.Evid. 403. We do not think the district court abused its discretion in this instance. As Patricia's counsel admitted at the time, other documentary evidence supported Patricia's testimony that Patrick was involved in legitimate businesses which could have generated the cash flow at issue. So too, there was testimony from witnesses to support Patricia's defense. For example, Mrs. Geneva Adams, Patrick's mother, testified to the existence of P.R. Realty and Development Corporation. Patricia's contention, that the exclusion of the tax returns left nothing to corroborate her version of events, rings hollow. *See Hamling v. United States*, 418 U.S. 87, 127, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) ("The District Court retains considerable latitude even with admittedly relevant evidence in rejecting that which is cumulative, and in requiring that which is to be brought to the jury's attention to be done so in a manner least likely to confuse that body."). We are satisfied that the district court did not abuse its discretion in excluding the tax returns.

### C. *The Fine*

■ Patricia's final argument concerns the fine imposed upon her by the district court. Patrick joins in this assertion of error. Prior to sentencing, the Cunans filed a joint motion to waive fines. The motion was based upon the self-reported financial disclosure statements provided to the probation department. In those statements, the Cunans contend that they have precious little funds, and are in possession of only their marital home.

The government introduced evidence to support the request for substantial fines. Specifically, the government produced a summary of the Cunans' personal income tax returns. This summary indicated that the Cunans' *interest* income had been $116,000 in 1988, and $98,000 in 1989. These were the years just prior to the scheme's collapse. There was evidence at trial that the Cunans

---

**4.** Throughout her discussion of the *Brady* issue, Patricia also suggests a variety of other ways in which the withheld "memory loss" information deprived her of a fair trial. For example, she suggests that, upon learning that Proulx would not be called as a witness, she ceased her investigative efforts aimed at disproving his proposed testimony. These tangential arguments are so undeveloped as to be deemed waived. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990).

**5.** The quote is from the mouth of the Assistant United States Attorney. Judge Young stated immediately afterward that he agreed.

had lent money to friends and business acquaintances over the years, with principal amounts outstanding in excess of $1 million. Evidence was also before the court which indicated significant land holdings on the part of the Cunans, above and beyond the land the government sought forfeited.[6]

▮ Under the Sentencing Guidelines, "[t]he court shall impose a fine in all cases, except where the defendant establishes that he [or she] is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2. The district court imposed a fine of $750,000.00 on Patricia, and $2,500,000.00 on Patrick. We review the imposition of a fine for abuse of discretion. *United States v. Savoie*, 985 F.2d 612, 620 (1st Cir.1993). We detect no abuse here.

▮ "The defendant bears the burden of demonstrating that his [or her] case warrants an exception to the rule that a fine be imposed." *United States v. Peppe*, 80 F.3d 19, 22 (1st Cir.1996). Here the defendants based their entire request for waiver of fines on self-reported financial disclosure statements. Beyond this, no attempt was made to rebut the government's compelling evidence that they had sufficient resources to pay a fine. Because neither Patrick nor Patricia "establishe[d] that he [or she] is unable to pay," U.S.S.G. § 5E1.2, the district court acted well within its discretion in imposing the fines.

## III.

### Patrick Cunan

#### A. *Judicial Bias*

▮ Patrick's first argument concerns what he contends was misconduct on the part of the trial judge. Specifically, he takes issue with Judge Young's practice of holding up exhibits for the government, so that the jury could view the enlargements while the witness testified. The record indicates that Judge Young did this regularly, but that he also held up exhibits for the defense during cross-examination.

▮ Patrick asserts he was denied his right to a fair trial because the practice gave the jury the impression that Judge Young was acting as the prosecutor's "assistant." Judge Young instructed the jury that "when we have big things and we have a witness on the stand, we found that it makes sense—and I don't mind doing it, and I'll do it for everybody—if I hold them up, because then people don't have to get down. It saves time." No objection to the practice was lodged at the time, and we therefore review for plain error. *See* Fed.R.Crim.P. 52(b). "To obtain relief based on plain error, an appellant must show that the trial judge committed an error that constituted a '[d]eviation from a legal rule'; that the error was obvious and 'clear under current law'; and, that the error affected 'substantial rights.'" *United States v. Bartelho*, 129 F.3d 663, 673 (1st Cir.1997), *pet. for cert. filed* (U.S. June 5, 1998)(No. 98–5442) (quoting *United States v. Olano*, 507 U.S. 725, 733–34, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)).

▮ "It is well-established that a judge is not a mere umpire; he is 'the governor of the trial for the purpose of assuring its proper conduct,' and has a perfect right—albeit a right that should be exercised with care—to participate actively in the trial proper." *Logue v. Dore*, 103 F.3d 1040, 1045 (1st Cir.1997) (quoting *Quercia v. United States*, 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321 (1933)). Our inquiry into whether a trial judge has crossed the line in claims of this kind focuses on "whether the complaining party can show serious prejudice." *Id.* Thus, where the judge participates actively, "the judge's participation must be balanced; he cannot become an advocate or otherwise use his judicial powers to advantage or disadvantage a party unfairly." *Id.* In the final analysis, we examine claims of prejudice "according to a standard of fairness and impartiality, recognizing that each case tends to be fact-specific." *United States v. Polito*, 856 F.2d

---

**6.** The government sought forfeiture of certain of the Cunans' land holdings. These efforts are the subject of related appeals before this panel, the district court having determined that such forfeiture was barred by operation of *res judicata*. *See* Nos. 96–1235, 97–1470. The outcome of those appeals is irrelevant to our determination on this issue.

414, 418 (1st Cir.1988) (citations and internal quotation marks omitted).

Under these facts, we detect no prejudice, and therefore no error. First, we find it difficult to understand the argument that the judge displayed partiality in the course of this conduct when he also held up exhibits for the defense. Although he was called upon to do this far more frequently for the government, this imbalance is not attributable to bias. Instead, it is the result of the fact that the government's case was document-intensive, and the appellants' defense was not. Nor do we think the record supports the argument that this practice conveyed bias to the jury. Judge Young was careful to clearly state that this practice was a courtesy to the witnesses, and was done in the interest of saving time. Moreover, the jury was instructed about the purpose of the judge's practice *contemporaneously* with the first instance of actual assistance. Thus, if there was the threat of unintended taint, we think it was effectively muted from the outset. We therefore do not think the district court's practice deprived Patrick of a fair trial.[7]

### B. *The Cross–Examination Errors*

 Patrick next asserts that his constitutional right to effective cross-examination was infringed by the district court's decision to restrict a certain line of cross-examination on hearsay grounds. At numerous times during the trial, Patrick's counsel questioned witnesses on cross-examination as to whether DeCato had ever told them that he had made $1 million as a result of his investment in the recovery of silver bars from the shipwreck "Atocha." The district court consistently sustained the government's objections, finding that the questions called for hearsay. Patrick asserts on appeal, as he did in the district court, that he was not attempting to establish the truth of the matter asserted— that DeCato's funds came from salvaging efforts—but instead that DeCato had a pattern of misrepresenting to others that his money came from legitimate sources. It would follow, then, that DeCato would have

used a similar "line" on the Cunans. Thus, Patrick urges, restriction of this line of cross-examination so infringed Cunan's rights to present a defense that a new trial is warranted.

Patrick's argument is based on *United States v. Mulinelli–Navas*, 111 F.3d 983 (1st Cir.1997), where we reversed a conviction and remanded for a new trial on the basis of the district court's refusal to permit certain cross-examination, *id.* at 993. We reiterated that "[t]he Sixth Amendment, and thus the constitutional minimum that must be allowed a criminal defendant before a trial court's discretion to limit cross-examination adheres, includes the ability to develop and present a defense." *Id.* at 992. Crucial to our decision was the fact that in *Mulinelli–Navas*, the district court's limitation "foreclos[ed] the introduction of *any* testimony to support Mulinelli's theory of defense." *Id.* (emphasis in original).

Patrick's argument turns initially on whether the district court's restriction of cross-examination foreclosed his ability to present this particular defense. We think it did not. The record reveals that there was ample evidence generated by the government's case to support Patrick's theory of defense. Numerous witnesses testified throughout the trial that DeCato represented to them that he was either in the construction business, or an investor in property, or a condominium manager, or a collector of precious metals. We do not think it particularly relevant that this evidence came in during the government's direct examination as opposed to the Cunans' cross-examination. It was testimonial evidence which directly supported the defense theory. It provided an evidentiary basis for Patrick to urge the jury to infer that DeCato had similarly misrepresented the source of his income to the Cunans. *Mulinelli–Navas* is therefore largely inapposite to this case.

Because there was sufficient evidence before the jury from which to present this defense, the "trial court's discretion to limit cross-examination adhere[d]." *Mulinelli–Navas*, 111 F.3d at 992. The district court

---

**7.** We do not intend this holding to imply an unqualified endorsement of the district court's practice. We merely hold that, under these facts, it did not deprive Patrick of a fair trial.

ruled that if Patrick wanted to introduce evidence suggesting that DeCato had made a considerable amount of money due to his involvement with the "Atocha", he had to do so with competent evidence, not hearsay. Similarly, the trial court ruled that if the Cunans wanted to introduce evidence as to what DeCato had told others about the "Atocha" in order to prove that "the Cunans thought they were dealing with treasure ship money rather than drug money," they would first have to show some communication about the "Atocha" treasure from DeCato to the Cunans. The court was clear that it would be receptive to such evidence. We detect no abuse of discretion in the restriction of cross-examination.

In a related vein, Patrick asks us to "note" that the district court somehow failed to assist Patrick in compelling the appearance of Mel Fisher, the head of the "Atocha" salvage operation. At the end of the fifteenth day of trial, the Cunans' attorney asked the district court what the procedure would be for compelling the appearance of Fisher. The district court responded that it would first have to determine whether it had the power to order Fisher to appear, before holding a hearing on whether to exercise that power. Patrick takes issue with the district court's comment, "I rather doubt that I have the power to order someone who is a resident in Florida [to] present themselves in Massachusetts." The next day, however, the Cunans' counsel stated that "we will not be getting into the Atocha." Accordingly, no hearing was ever held, and there was no request that Fisher be compelled to appear.

## C. *The Willful Blindness Instruction*

Patrick's final assertion of error concerns the giving of a willful blindness instruction to the jury. Two claims are made. First, Patrick alleges that it was error for the court to instruct on willful blindness at all because there was insufficient evidence to support the instruction. Because a timely objection was lodged to the giving of the instruction, we review its propriety for abuse of discretion. *See United States v. Mitchell,* 85 F.3d 800, 809 (1st Cir.1996). Second, Patrick contends that the language

of the instruction was incorrect because it failed to specifically instruct that mere recklessness or negligence is not enough to support a finding of willful blindness. Because this specific assertion of error was not raised below, we review for plain error. *See United States v. O'Connor,* 28 F.3d 218, 221 (1st Cir.1994).

With regard to Patrick's first contention, we detect no abuse of discretion in the district court's decision to instruct on willful blindness. We stated in *United States v. Brandon,* 17 F.3d 409, 452 (1st Cir.1994), that "[t]he trial court may instruct the jury concerning willful blindness when a defendant claims a lack of knowledge, the facts support an inference of defendant's conscious course of deliberate ignorance, and the instruction, taken as a whole, cannot be misunderstood by a juror as mandating the inference of knowledge." Patrick argues that when there is an "absence of evidence showing deliberate acts, on Defendant's part, aimed at avoidance of actual knowledge, then the willful blindness instruction should not be given." Patrick's Br. at 27. But this is not the law. All that is required is that "the facts *support an inference* of defendant's conscious course of deliberate ignorance." *Brandon,* 17 F.3d at 452 (emphasis added).

We think the facts of this case sufficiently supported the inferences necessary to permit the district court to instruct on willful blindness. There was evidence which tended to show that the Cunans were closely involved with DeCato's extensive purchases, and were aware that he was purchasing goods and property under false names. There was also evidence that they knew that he was a fugitive from a drug trafficking charge, yet accepted large amounts of cash from DeCato, turning that cash into checks for his purchases. In the face of this, they adamantly maintain that they did not know DeCato's funds came from drug trafficking. This evidence supports an inference of conscious avoidance. *See United States v. Gabriele,* 63 F.3d 61, 66–67 (1st Cir.1995) (finding similar "red flags" of criminal activity sufficient to support instruction).

Turning to Patrick's second assertion, we detect no plain error. The district court's instruction was as follows:[8]

> [Y]ou may infer that a person had knowledge from circumstantial evidence or evidence showing willful blindness by that person. Willful blindness exists when a person, whose suspicion has been aroused deliberately fails to make further inquiries. If you find that a person had a strong suspicion and someone withheld important facts, yet shut his or her eyes for fear of what he or she would learn, you may conclude that the person acted knowingly.

Patrick asserts that this instruction should have included a statement that mere recklessness or negligence is not enough to support a finding of willful blindness. He is correct that our recent decisions on the issue have approved instructions that included such language. *See, e.g., Brandon,* 17 F.3d at 452 n. 72; *United States v. Richardson,* 14 F.3d 666, 671 (1st Cir.1994). We stated in *Brandon* that "[t]he danger of an improper willful blindness instruction is the possibility that the jury will be led to employ a negligence standard and convict a defendant on the impermissible ground that he should have known an illegal act was taking place." 17 F.3d at 453 (internal quotation marks and alterations omitted); *see also First Circuit Pattern Jury Instructions—Criminal* § 2.14 (West 1998). But we think the instruction at issue was adequately worded to avoid such a danger. The instruction speaks of conscious acts of avoidance—"deliberately fails to make further inquiries," "shut his or her eyes." This language conveys the proper standard to apply in assessing the Cunans' conduct, and fairly read, does not suggest that anything less will suffice. We therefore find no plain error.

As a final note, we do not understand Patrick's contention that the district court failed to instruct the jury that it must find willful blindness beyond a reasonable doubt. The record demonstrates that the court instructed the jury that the government must prove the knowledge element of the offense beyond a reasonable doubt, before outlining the ways in which the knowledge element could be satisfied, including willful blindness.

## IV.

Based on the record and the law, we are confident that both appellants received a fair trial. The judgments below are ***AFFIRMED.***

---

8. This instruction was later repeated.