<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                 United States Court of Appeals
                     For the First Circuit
                      ____________________

No. 98-1895

                         UNITED STATES,

                           Appellee,

                               v.

                          JOHN BILIS,

                     Defendant, Appellant.

                      ____________________

          APPEAL FROM THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF MASSACHUSETTS

        [Hon. Nathaniel M. Gorton, U.S. District Judge]

                      ____________________

                             Before

                    Torruella, Chief Judge,

Aldrich and Cudahy, Senior Circuit Judges.

                     _____________________

    Roger A. Cox, with whom Cox & Cox, was on brief, for
appellant.
    Heidi E. Brieger, Assistant United States Attorney, with whom
Donald K. Stern, United States Attorney, was on brief, for
appellee.

                      ____________________

                        March 10, 1999
                      ____________________

         TORRUELLA, Chief Judge.  On September 18, 1997, a grand
jury returned an indictment charging defendant-appellant John Bilis
with violating 21 U.S.C.  856 (a)(2) by knowingly and
intentionally managing and controlling a building for the purpose
of the unlawful distribution and use of controlled substances.  A
trial commenced on April 6, 1998 and the jury ultimately returned
a guilty verdict.  The district court sentenced Bilis to a twenty-
one month term of imprisonment, to be followed by twenty-four
months of supervised release.  On appeal, Bilis claims that the
district court erred in giving a willful blindness jury
instruction.  We affirm.
I.  BACKGROUND
         We recite the facts in the light most favorable to the
verdict.  United States v. Cunan, 152 F.3d 29, 32 (1st Cir. 1998)
(quotations omitted).  In the fall of 1996, the Webster Police
Department (the "WPD") received information about narcotics
trafficking at the High Street Caf in Webster, Massachusetts.  
Specifically, the WPD received information that on September 19,
1996, an individual known as William Armstrong would be selling
drugs at the High Street Caf.  Pursuant to this information,
Webster police officers went to the bar, located Armstrong on the
street outside, and followed him into the bar.  Armstrong was then
arrested on outstanding warrants.  Subsequent to Armstrong's
arrest, WPD officers seized a sandwich bag containing cocaine from
the corner space between the men's restroom and the bar.
         At the time of Armstrong's arrest, Bilis, the owner and
bartender of the High Street Caf, was working behind the bar.  WPD
officers questioned Bilis about the bag of cocaine.  Bilis
indicated that he knew nothing about it.  WPD officers then warned
Bilis that he could be at serious risk of losing his liquor license
due to possible drug violations.
         Shortly after this incident, Bilis arranged to meet with
WPD officers to discuss suspected drug dealing at the High Street
Caf.  During this meeting, Bilis suggested that the WPD install a
surveillance camera in the bar.  Bilis also agreed to the possible
placement of an undercover officer in the bar to investigate the
drug problem.  WPD officers asked Bilis to name the drug dealers
who frequented his bar.  Bilis responded:  "You know who they are."  
When the officers named several individuals they suspected, Bilis
nodded.  Following this meeting, WPD officers dropped by the High
Street Caf several times a week.  During those visits, Bilis
identified several bar patrons he suspected were drug dealers.
         Three months later, beginning in December 1996, the WPD
launched an undercover investigation of drug dealing at the High
Street Caf.  Officer Stephanie Healy, a WPD undercover officer,
began frequenting the caf to gain intelligence and to make
controlled purchases from suspected drug dealers.  Bilis was not
informed of this undercover investigation and did not know that
Healy was an undercover officer.
         Beginning on February 5, 1997, Healy made numerous
controlled cocaine purchases at the High Street Caf.  At trial,
Healy testified that there were so many drug dealers working at the
High Street Caf that the drug business environment could be
characterized as "competitive."  Healy described the caf as a bar
with several stools, four or five tables, and a pool table.  Healy
testified that she normally made controlled cocaine purchases
directly in front of the bar, at one end of the tables, or in the
women's restroom.  Bilis was present in the bar almost every night.  
         Officer Healy testified that on February 20, 1997, she
overheard Bilis tell Michael Plasse, a suspected drug dealer, to
"clean up" because he did not want the police to see any plastic
baggies lying around on the floor.  Bilis instructed Plasse to
flush all baggies down the toilet.
         In April 1997, the United States Drug Enforcement
Administration (the "DEA") took over the WPD investigation.  On
April 30, 1997, DEA agents conducted surveillance of the High
Street Caf while Healy made a controlled purchase of cocaine
inside the bar.  During Healy's purchase a DEA agent was located in
an undercover surveillance van parked outside the bar.  At trial,
Healy testified that while she was in the bar it became clear from
the commotion that some bar patrons had spotted the DEA
surveillance van.  Tina LeMay, a bar patron, testified that whoever
was tending bar that night closed the shutters of the window
overlooking the street after patrons spotted the van.  William
Sblacers, another patron, testified that Bilis warned him to be
careful because there was a police surveillance van parked outside.  
         On May 29, 1997, Bilis became a target of the DEA
investigation.  On that date, Healy approached Sblacers at the High
Street Caf to make a controlled cocaine purchase.  Sblacers
informed Healy that he did not have any cocaine but that he and
several others -- including Bilis -- were waiting for a delivery
from cocaine distributor Stephen Reyes.
         On August 29, 1997, Healy entered the High Street Caf to
make a controlled cocaine purchase from Reyes.  Healy sat at the
bar, where she was joined by Bilis.  Healy asked Bilis if he knew
of Reyes's whereabouts.  Bilis told Healy that he had seen Reyes
earlier in the week, but he did not know where he was now.  Healy
then asked Bilis if he knew whether there was anyone else in the
bar who could get her "a little something."  In response, Bilis
looked around the bar and replied: "No, I do not.  That's what I'm
down here for."
    At trial, Sblacers testified that he was arrested on
September 27, 1997 and was currently in jail on drug charges.  
Sblacers hoped to "get a break" at sentencing because of his
testimony for the government.  According to his testimony, Sblacers
usually sold at least six packages of cocaine to High Street Caf
customers between midnight and 1:00 AM three to four times per
week.  Sblacers testified that Bilis bought cocaine directly from
him at the bar.  Sblacers testified that he also sold cocaine to
Bilis through another bartender, Lynn DuFault.  At one point, Bilis
asked Sblacers to talk to "the guys" and tell them to be more
careful because he did not want to lose his liquor license.  Bilis
also warned Sblacers about the DEA surveillance van parked outside
of the bar on April 30, 1997.
    Tina LeMay was also arrested on September 27, 1997 for
possession of controlled substances with intent to distribute.  At
trial, she testified that she passed cocaine over the bar to Bilis
in a folded dollar bill.  According to her testimony, she also sold
cocaine to Bilis through Lynn DuFault.  LeMay testified that
although drug dealing at the High Street Caf was covert, she did
not try to conceal it from Bilis.
    Leonardo Gonzlez testified that he sold drugs to Bilis
two to three times a week, so many times that "it would be
impossible to count."  Gonzlez further testified that he observed
Bilis watch as a bar patron tasted cocaine from an open bag in the
men's room.  Finally, Gonzlez testified that Bilis sold him a
$2,000 lottery ticket so that Gonzlez could "clean" his drug
proceeds.  At the time of his testimony, Gonzlez was serving a
three to five year sentence in Massachusetts for drug-related
offenses.
    During his trial testimony, Bilis denied having ever
participated in the sale of illegal drugs.  Specifically, he denied
having ever purchased cocaine from Sblacers, LeMay or Gonzlez.  
Bilis further testified that he never observed any hand-to-hand
drug transactions at the bar.  He denied seeing a bar patron taste
cocaine from a plastic bag in the men's room.  He denied warning
anyone about a police surveillance van parked outside the bar on
April 30, 1997.  Finally, he denied having ever suggested that the
sale of the lottery ticket would "clean" Gonzlez's drug money.
    With respect to the plastic baggies, Bilis testified that
he recalled seeing Plasse exit the men's room with plastic tops or
knot tops, but that he did not specifically know that Plasse was
selling cocaine.  Bilis admitted that he was concerned about the
plastic bags but refused to admit that he knew the baggies
contained (or had contained) cocaine.  Rather, Bilis testified that
he merely "speculated" that drug dealers were selling drugs in his
bar.  Throughout his testimony, Bilis maintained that he did not
have any direct, actual knowledge of drug activity in his bar.
    At the conclusion of trial, the government filed its
proposed jury instructions, requesting that the district court give
the jury a willful blindness instruction.  At the jury charge
conference, defense counsel objected to the government's request.  
At the start of the next day's proceedings, the district judge
announced his decision to grant the government's request and give
the willful blindness instruction.  At the conclusion of the jury
instructions, defense counsel renewed his objection to the
instruction.  Bilis now appeals.
II.  DISCUSSION
    In order to convict Bilis of violating 21 U.S.C.  856
(a)(2), the government needed to prove three elements beyond a
reasonable doubt: (1) that Bilis managed or controlled the High
Street Caf; (2) that Bilis knowingly and intentionally made the
High Street Caf available for use to others; and (3) that Bilis
made the High Street Caf available for the purpose of unlawfully
possessing or distributing a controlled substance.  See 21 U.S.C.
856 (a)(2).  The government requested the willful blindness
instruction in order to prove the second element.  Pursuant to the
government's request, the district judge instructed the jury that:
                   the word "knowingly," as that term has been
                   used from time to time in these instructions,
                   means that the act was done voluntarily and
                   intentionally and not because of mistake or
                   accident.
                    
                   In deciding whether the defendant acted
                   knowingly, you may infer that he had knowledge
                   of a fact if you find that he deliberately
                   closed his eyes to a fact that otherwise would
                   have been obvious to him.  In order to infer
                   knowledge, you must find that two things have
                   been established; first, that the defendant
                   was aware of a high probability of unlawful
                   possession or distribution of controlled
                   substances in the High Street Caf; and,
                   second, that he consciously and deliberately
                   avoided learning of that fact; that is to say,
                   the defendant willfully made himself blind to
                   that fact.   
                    
                   It is entirely up to you to determine whether
                   Mr. Bilis deliberately closed his eyes to the
                   fact and, if so, what inference, if any should
                   be drawn.  However, it is important to bear in
                   mind that mere negligence or mistake in
                   failing to learn the fact is not sufficient.  
                   There must be a deliberate effort to remain
                   ignorant of the fact.
                    
         Because Bilis made a timely objection to this instruction, we
review for abuse of discretion.  See Cunan, 152 F.3d at 39.  
    This court has previously identified the circumstances
warranting a willful blindness instruction:
                   A willful blindness instruction is warranted
                   if (1) the defendant claims lack of knowledge;
                   (2) the evidence would support an inference
                   that the defendant consciously engaged in a
                   course of deliberate ignorance; and (3) the
                   proposed instruction, as a whole, could not
                   lead the jury to conclude that an inference of
                   knowledge was mandatory.
                    
         United States v. Gabriele, 63 F.3d 61, 66 (1st Cir. 1995).  More
specifically, a willful blindness instruction is proper when there
is evidence to "support the inference that defendant was aware of
a high probability of the existence of the fact in question and
purposely contrived to avoid learning all of the facts in order to
have a defense in the event of a subsequent prosecution."  United
States v. Brandon, 17 F.3d 409, 452 (1st Cir. 1994) (quoting United
States v. Rivera, 944 F.2d 1563, 1571 (11th Cir. 1973)).
    Bilis challenges the propriety of the willful blindness
instruction on two grounds.  First, Bilis argues that he never
claimed lack of knowledge of the drug dealing taking place in the
High Street Caf.  Bilis points to the fact that he voluntarily met
with officers of the WPD to discuss the issue of drug dealing in
his bar.  Bilis claims that this visit, by itself, wholly negates
the possibility that he lacked knowledge of the drug activities in
the bar.  Second, Bilis argues that his visit to the police also
undermines any claim that he "consciously engaged in a course of
deliberate ignorance" of the drug dealing taking place in the High
Street Caf.  
    With respect to Bilis's first argument, we conclude that
his 1996 visit to the WPD did not preclude the giving of the
willful blindness instruction.  During Bilis's visit to the police
he admitted only that he "speculated" that individuals were dealing
drugs in the bar.  Bilis disclaimed any specific or definite
knowledge of drug activities or dealers.  He testified: "I don't
think I actually seen anything where I could say I had knowledge
. . . Speculation is one thing.  Knowing is a different thing."  We
conclude that Bilis's denial of specific or definite knowledge
satisfies the first prerequisite for the giving of the willful
blindness instruction.
    Bilis's second argument fares no better.  Bilis's own
testimony clearly supports the inference that he purposely avoided
learning details about the drug dealing in the bar.  Specifically,
Bilis testified that he observed plastic baggies in the bathroom
and that he mentioned something to Michael Plasse about them: "And
I got in an argument . . . with him [and] he ended up being thrown
out [of the bar] for sixty days."  When asked what he thought the
plastic bags were used for, Bilis responded: "I have no idea . . .
What was on the other end of [the plastic knot top], I don't know."  
This testimony clearly supports the inference that Bilis purposely
avoided learning about the drug dealing taking place in his bar.
    Officer Healy's testimony further supports this
inference.  She described the drug business environment at the High
Street Caf as "competitive" and testified: "There were several
people there, all selling drugs . . . . Sometimes there were so
many of them there . . . I had to wait until one person left so I
could make a drug purchase."  Officer Healy further testified that
she made several drug transactions while sitting on a stool
directly in front of the bar.  This testimony coupled with Bilis's
own admission that he "speculated" about drug activity in his bar  
further supports the inference that Bilis was aware of a high
probability of drug dealing in the High Street Caf and purposely
contrived to avoid learning all of the facts.  See Brandon, 17 F.3d
at 452.
    The fact that the government also offered evidence to
support the theory that Bilis possessed direct knowledge of drug
dealing did not render the willful blindness instruction
inappropriate.  This court has rejected the argument that proof of
direct knowledge precludes a willful blindness instruction that is
otherwise appropriate:
                   As long as separate and distinct evidence
                   supports a defendant's deliberate avoidance of
                   knowledge and the possibility exists that the
                   jury does not credit the evidence of direct
                   knowledge, a willful blindness instruction may
                   be appropriate.
                    
         Brandon, 17 F.3d at 452 n.74.  Two of the government witnesses who
testified as to Bilis's direct knowledge of and participation in
drug activities had an incentive to cooperate with the government.  
As the district judge noted at sentencing, it is possible that the
jury did not find some or any of their testimony credible.  For
example, the jury could have credited the witnesses' testimony
concerning the extent of the drug dealing in the High Street Caf,
while rejecting the testimony related to Bilis's actual involvement
in drug deals.  Even without the testimony of these witnesses,
separate and distinct evidence supported the government's alternate
theory of willful blindness.  The instruction was warranted under
the circumstances.
III.  CONCLUSION
    Based on the foregoing, we affirm the judgment of the
district court.

</body>

</html>